[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
October 15, 2004
THOMAS K. KAHN
CLERK

No. 01-14680

D. C. Docket No. 00-00070-CR-WCO-2-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RICHARD JUNIOR FRAZIER,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 15, 2004)**

Before EDMONDSON, Chief Judge, and TJOFLAT, ANDERSON, BIRCH,
DUBINA, BLACK, CARNES, BARKETT, HULL, MARCUS and WILSON,
Circuit Judges.[*]

MARCUS, Circuit Judge:

_____

[*]Judge William H. Pryor Jr., became a member of the Court on February 20, 2004, which
was after this case was argued. He did not participate in the decision of this case.

Richard Junior Frazier appeals his conviction for kidnapping. He claims that the district court abused its discretion by excluding certain expert testimony of a forensic investigator, while allowing the government to present expert evidence on the same issue. After thorough review of the record, we conclude that the district court's evidentiary rulings were neither an abuse of discretion, nor "manifestly erroneous." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142, 118 S. Ct. 512, 517, 139 L. Ed. 2d 508 (1997) (citation omitted). More generally, we reaffirm the basic principle that an appellate court must afford the district court's gatekeeping determinations "the deference that is the hallmark of abuse-of-discretion review." Id. at 143, 118 S. Ct. at 517. Accordingly, we affirm.

## I.

## A.

The defendant, Richard Junior Frazier, was charged on December 6, 2000, by a grand jury sitting in the Northern District of Georgia in a one-count indictment with kidnapping in violation of 18 U.S.C. § 1201(a)(1).[2] The

---

[2] The kidnapping statute, 18 U.S.C. § 1201, provides in pertinent part:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when--
>
> (1) the person is willfully transported in interstate or foreign

indictment also alleged that, pursuant to 18 U.S.C. § 3559(c), the "three-strikes"

statute, the defendant had multiple prior convictions for qualifying serious, violent

felonies to mandate a life sentence.[3] He entered a plea of not guilty and vigorously

contested the charges at trial.

The relevant facts in this sad case are these. At some time after eight

o'clock on the evening of October 31, 2000, an eighteen-year-old student ("the

---

> commerce, regardless of whether the person was alive when
> transported across a State boundary if the person was alive when
> the transportation began;
>
>      . . . .
>
> shall be punished by imprisonment for any term of years or for life
> and, if the death of any person results, shall be punished by death
> or life imprisonment.

18 U.S.C. § 1201(a).

[3]The indictment alleged, specifically, that Frazier had been previously convicted of the
following serious violent felonies:

> 1974 - #9519 - Armed Robbery - Gwinnett County Superior Court, Lawrenceville,
>      Georgia;
> 1974 - #43674 - Robbery - Hall County Superior Court, Gainesville, Georgia;
> 1979 - #K-45837 and K-45838 - Robbery by Force - Hall County Superior Court,
>      Gainesville, Georgia;
> 1980 - #11684 - Armed Robbery - Houston County Superior Court, Perry,
>      Georgia;
> 1980 - #80R-23 - Aggravated Assault - Crisp County Superior Court, Cordele,
>      Georgia;
> 1993 - #93-CR-94-S - Aggravated Assault - Habersham County Superior Court,
>      Clarkesville, Georgia.

victim") stopped at a Wal-Mart store in Cornelia, Georgia to check the prices of Halloween candy. According to the victim's account, she was abducted by the defendant after leaving the Wal-Mart. She walked to her car and unlocked the door, when she was confronted by the defendant, Frazier, who was carrying a knife in his right hand pointed at her. He asked the victim: "Will you take me where I want to go?" R7 at 149. Fearing for her life, the victim complied and at Frazier's demand sat in the driver's seat. Frazier entered the back seat of the vehicle, sat directly behind the victim, and directed her to drive out of the parking lot.[4]

Frazier initially told the victim that he wanted to visit his son in White County, Georgia, but eventually directed her off the paved road and onto a dirt road leading to a secluded, wooded area. After they reached this deserted location, Frazier instructed the victim to turn the engine off, moved into the front passenger seat, positioned the knife in his right hand, and ordered the victim to remove her pants and underpants. She disrobed. The defendant then removed his own clothing and sexually assaulted her at knifepoint, raping her repeatedly and

---

[4]A surveillance video camera trained on the Wal-Mart parking lot was played for the jury at trial. The video tape showed the victim walking alone toward her vehicle and approaching the driver's side of the car. The tape also revealed Frazier's approach, coming from behind the victim, and showed Frazier and the victim standing on the driver's side before entering the car. However, the video tape view was partially obscured, Frazier's hands were not visible, and the video did not show the knife.

4

variously in a crime of unspeakable brutality, in the front of the vehicle and in the back seat of her car. According to the victim, the defendant apologized for not being able to ejaculate because he was drunk.

After the sexual assaults were completed, the defendant dressed, took control of the car, and drove north on U.S. Highway 441 toward North Carolina. Frazier stopped twice, first at a Citgo convenience store where he bought gasoline, and then at a Circle-K store where he bought cigarettes. At both stops, Frazier made the victim accompany him into the convenience stores, warning her not to do anything "stupid."[5] R7 at 162, 163.

In the meantime, the victim's fiancé and family members became alarmed over her absence. Her fiancé, Anthony Defoor, expected to meet her after she visited the Wal-Mart, and by eleven o'clock, had become very concerned. He began searching for her and contacted her parents. The victim's mother called 911 to report her missing, and her father, Larry Kimsey ("Kimsey"), drove off in search of his daughter. Kimsey spotted his daughter's vehicle, followed it for several miles, and pulled up alongside it, noticing that his daughter was in the

---

[5]An in-store video surveillance camera in the Circle-K captured Frazier and the victim in that convenience store, and was played for the jury. The videotape showed the two entering the store and purchasing cigarettes. On the videotape, the victim was not visibly restrained by Frazier, and the store clerk testified that the victim did not seem noticeably upset or distressed, nor was it readily apparent that she was being directed by Frazier.

5

front passenger seat and a stranger was driving the car. He attempted unsuccessfully to flag down his daughter's car by driving alongside the vehicle, flashing his brake lights, and rolling down his windows and motioning with his arm for the car to stop. Kimsey continued to chase the vehicle, mile after mile, at speeds up to 80 miles per hour. Indeed, when Kimsey pulled alongside his daughter's car, the defendant swerved and cut him off. Eventually, although he was unable to stop the car, Kimsey was able to attract the attention of a passing deputy sheriff by repeatedly flashing his brake lights.

At this point, the officer driving a marked police car made a u-turn and began chasing the two vehicles. The deputy activated his flashing blue lights in an attempt to stop the victim's car, but Frazier did not pull over. The deputy called for back-up and additional officers joined the chase, pursuing the victim's car with their lights and sirens activated. Still, Frazier did not stop; instead he accelerated the vehicle, leading the police on a chase at speeds of up to 100 miles per hour for many miles, passing stop signs, repeatedly crossing the center line, and running red lights without slowing or stopping.[6] Twice, when law enforcement officers

---

[6]At trial, consistent accounts of the defendant's flight from police were given by the victim, Kimsey, and three of the officers involved in the chase: Shawn Wilson, a deputy sheriff with the Rabun County Sheriff's Department, Sergeant Terry Smith of the Macon County Sheriff's Department, and Donald Willis, a deputy sheriff with the Macon County Sheriff's office. In addition, videotapes recorded by video equipment in the vehicles of Sergeant Smith and Deputy Sheriff Willis were played at trial, and reinforced the officers' accounts.

6

tried to cut him off, Frazier tried to hit their cars. Frazier continued his flight at high speeds, crossing into North Carolina, and driving north on North Carolina Route 28. Driving at high speed on this twisting, winding road, Frazier frequently swerved out of the proper lane, until eventually he lost control of the vehicle and crashed into a power pole alongside Route 28. The officers radioed for emergency medical and fire authorities.

The police immediately removed both Frazier and the victim from the car. After being asked why the vehicle was fleeing the police, the victim replied that the defendant had kidnapped her from the Wal-Mart at knifepoint. When Frazier was searched immediately following his arrest, the officers discovered two knives on his person. One of the knives was found in his right hip pocket, locked in the open position with a partially serrated blade.

The victim was transported to a local hospital where, because she claimed to have been sexually assaulted, she was treated by a Sexual Assault Nurse Examiner. The nurse examined the victim and prepared a rape kit by removing loose hairs from the victim and from her clothing. She also swabbed for fluids. The nurse-examiner later testified that the victim's manner and demeanor were consistent with what she described as a post-traumatic stress demeanor, and said

7

that the victim had suffered traumatic bruising to her cervix.[7]  Later testing of the swab and hair evidence recovered from the examination failed to establish that any hair or fluid recovered from the victim's person or clothing matched Frazier's. Similarly, although various pieces of evidence, including seat upholstery, were removed from the victim's car, no hair or fluid evidence was recovered that matched the defendant's.

When the victim testified at trial, she gave a detailed account of these events that was consistent with those recounted by her father, and by three of the police involved in the pursuit of Frazier. On cross-examination, Frazier vigorously challenged the victim's account.  Frazier elicited from the victim that at some point after the night of her abduction, she retraced the route she and Frazier had taken with law enforcement officers, and initially was unable to locate the dirt road on which the sexual assaults had taken place.  Frazier's counsel questioned the victim regarding the sexual assaults, asking her to recount, in detail, nearly a dozen sexual acts that occurred in the front of the vehicle, as well as in the back seat.  Frazier elicited the fact that the victim had not mentioned that she had been sexually assaulted to the first doctor, a male, who examined her at the hospital.

---

[7]The nurse did not offer an opinion regarding the cause of this bruising to the cervix, stating only that the injury was not caused by the automobile accident.

The victim also conceded that she had lit a cigarette for the defendant while they were in the car together.

On the evening after his arrest Frazier was questioned, and, after receiving Miranda[8] warnings, he gave an account of the previous evening that differed dramatically from the victim's account. Frazier told an FBI agent interviewing him that he had been drinking beer all day, and "had a good buzz on" after consuming three twelve-packs. R7 at 211, 214. Frazier recounted that he was sitting on a bench outside the Wal-Mart, wearing a baseball hat that read "Official Booze Guzzling, Beer Chugging, Sud Sucking, Ass Kicking Party Cap," id. at 218, when he was approached by the victim, a complete stranger, who initiated a conversation with him and offered to give him a ride back to his residence.

After he accepted the offer, according to Frazier, they began to drive around; when Frazier mentioned an ex-girlfriend in Silva, North Carolina, whom he wanted to visit, the victim offered to drive him there and he accepted. The defendant also told the FBI that the victim asked him to drive the car, even though he had consumed a large amount of alcohol and had told her that he did not have a valid driver's license. Finally, Frazier said that he refused to pull over when chased by the victim's father and the police only because the victim told him not

---

[8]See Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

9

to stop. According to Frazier, the victim told him not to stop the car because if he did, her father "would beat his ass." Id. at 217. There is no evidence that Frazier acknowledged to the FBI that he had swerved to hit or cut off either Kimsey or any of the police officers chasing him. Frazier denied that any sexual contact had occurred.

B.

Prior to trial, Frazier gave notice to the government that he intended to offer the expert testimony of Robert Tressel, a forensic investigator and former police officer. In essence, Tressel was prepared to testify that none of Frazier's hairs or bodily fluids were recovered from the victim, her clothes or her car; that "it would be expected that some transfer of either hairs or seminal fluid would occur in this case," Def. Ex. 2; and that "there is no forensic evidence to substantiate the claim of rape in this case." Id. The object of this testimony and, indeed, the basic thrust of Frazier's defense, was that the victim fabricated her account of kidnapping and rape in order to avoid being punished by her parents for violating her curfew. To establish this defense, Frazier hoped to undermine the credibility of the victim's account of abduction and rape by, among other things, suggesting that she had lied about the sexual assaults.

The Government timely moved in limine to exclude Tressel's testimony under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and the district court conducted a thorough Daubert hearing before trial. At the hearing, Tressel testified that he had been a police officer in Cobb County, Georgia, for more than a decade. For ten years, Tressel worked as an investigator in Cobb County's Crimes Against Persons Unit, which investigated homicides, rapes, other sexual assaults, and armed robberies. Tressel said that during his tenure in Cobb County he worked on thousands of cases, including between 150 and 250 sexual assault cases. In addition, he worked for thirteen years in the Cobb County Medical Examiner's Office.

At the time he testified, Tressel was self-employed as a consultant in the area of forensic investigations. Tressel recounted the forensic training he had received, which included training in crime scene processing for his work with the Cobb County Police Department; additional education at the University of Georgia in crime scene analysis and processing; and "training at the University of Virginia through Quantico, the FBI laboratory, on crime scene processing." R5 at 12. Tressel also stated that he had "been involved in criminalistic studies that were put on by the FBI at various law enforcement academies" in the state of Georgia, id., and explained that "the chief of police magazine that has sections on it where you

11

can conduct kind of an at-home study program where you go through and you have to answer certain questions and everything. I have been involved in that." Id. at 13. Tressel said that he had taught classes in crime scene investigation at the North Central Law Enforcement Academy and at the Northwest Georgia Law Enforcement Academy, and had qualified as an expert in various state and federal courts.

After presenting his general qualifications, Tressel opined that, based on all of the information which was available to him, it appeared that the forensic investigation of the alleged sexual assault had been performed properly and thoroughly. Tressel testified that he saw "no forensic evidence to substantiate the claim of rape in this case." R5 at 25. Tressel offered the view that, given the allegations of sexual assault made by the victim, "[t]here should have been some transfer of either hairs, fibers or fluids between the victims [sic] in this case." Id. at 27. Or, as he put it in his expert report, "[w]ith the amount of sexual activity described . . . it would be expected that some transfer of either hairs or seminal fluid would occur." Def. Ex. 2 at 2. Tressel also opined that, after reviewing the report of the victim's medical examination, he concluded that the reported conditions were consistent with the victim's account that she had had sexual intercourse with her boyfriend on the day preceding the examination. Tressel

12

explained that the victim's condition would be consistent with either a sexual assault or the consensual sexual contact she described.

On cross-examination, the government sought to elicit from Tressel the foundation for his opinions. Tressel acknowledged, first, that as for his medical opinions, he had no training in performing medical examinations generally, or, specifically, in performing pelvic examinations of female sexual assault victims. Tressel conceded that he had no education, training or experience as a doctor, and that he was not a physician.

The government also questioned Tressel at some length concerning the bases for his opinions that hair was the most common form of forensic evidence found in rape investigations, and that "it would be expected that some transfer of either hairs or seminal fluid would occur." Tressel said that he relied on his experience and a text entitled Practical Aspects of Rape Investigation, by Robert Hazelwood and Ann Burgess, for the opinion that the transfer of hair is the form of forensic evidence most commonly found in rape investigations.[9] When asked to clarify what in his experience provided a more specific foundation for his general

---

[9] Frazier did not proffer this or any other text into evidence to support Tressel's opinions. Tressel also said that he relied on another text, "Crime Scene Search and Physical Evidence Handbook, by Carl Cunningham," R5 at 37, which was not offered into evidence. See Richard H. Fox & Carl L. Cunningham, Crime Scene Search and Physical Evidence Handbook (U.S. Dept. of Justice 1973).

opinions, Tressel identified a single investigation he had worked on, in which hair evidence was recovered during the investigation of a serial rapist. He cited to no other case or investigation, and made no effort to quantify in any way the number of cases he was personally involved in that showed a transfer of hair or seminal fluid.

Tressel also observed that "I don't think anybody has ever studied the rates of transfer" of hair evidence, and clarified that he was not familiar with <u>any</u> scientific literature on the rate of transfer of hair in sexual assault cases. R5 at 37. Tressel again cited his experience (albeit only as a general matter) and the Hazelwood and Burgess text as the foundation for his opinion that seminal fluid was frequently found in sexual assault cases.

The government then explained the reasons underlying its motion to exclude Tressel's opinions in these terms:

> If you look back at what the witness stated, he says the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim.

> There is no evidence placed before this court at this hearing as a basis for the admission of this evidence that a lack of hair evidence found means necessarily that no sexual assault took place. There is no evidence that's been placed before you that leads you, your Honor, to conclude that hair will be transferred in X percentage of cases . . . .

All we have is there is no transfer here, and hair is the most commonly found piece of evidence during a rape investigation. No evidence that when he says it's most commonly found, no evidence that that means that it's found in 90 percent of the cases, 70 percent of the cases, 3 percent of the cases, and seminal fluid evidence is found in only two percent of the cases. . . .

. . . .

There is no evidence that routinely in a rape investigation you will have hairs transferred or hairs found. None. Nothing before the Court to that effect.

. . . .

. . . Again, there is no evidence that a lack of seminal fluid present or found means necessarily that no sexual assault or sexual contact took place.

Id. at 44-46. The government argued that Tressel provided no foundation or support, either from the relevant literature or from his own experience, for his specific opinion that the recovery of hair or fluid evidence "would be expected" in a case like this one. The government also objected to Tressel's proffered medical opinions based on the lack of any medical training and the fact that he had not personally examined the victim.

The district court ruled that Tressel was qualified to testify and could explain the standard procedures employed in investigating the crime scene of a sexual assault, that Tressel could recount that no hair or fluid matching Frazier's

15

was found on the scene, and that "the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs." Def. Ex. 2 at 2.[10] Conversely, however, the district court ruled that Tressel would not be

---

[10] Specifically, the district court ruled that Tressel could offer the following testimony based on these paragraphs taken from his expert report:

> [A] thorough examination of the motor vehicle was performed by [the] Evidence Recovery Team.
>
> . . . [T]he laboratory was unable to find any transfer of any head or pubic hairs from the suspect, Richard Frazier, to the body of [the victim], or to the interior of the vehicle.
>
> . . . .
>
> . . . All [tests] were negative for seminal fluid [and for blood].
>
> . . . During the course of a rape investigation, it is an investigator's responsibility to collect all pertinent evidence that can be of assistance in determining whether or not an alleged sexual assault has occurred. It is the duty of the investigator to substantiate the alleged claim of sexual assault, whether it be rape or sodomy charges, through the collection of forensic evidence.
>
> The forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim. These hairs are routinely pubic hairs that become transferred during sexual intercourse. Head hairs can also be transferred during a sexual assault and can be found in the clothing of both the victim and the perpetrator.
>
> Seminal fluids are frequently found in sexual assault cases, especially when multiple episodes of sexual activity occur and no condom is used by the perpetrator. These fluids can be found not only in the orifices of the victim, but also on the clothing worn by both the victim and the perpetrator.
>
> In review of the documents that I have been provided on this

16

permitted to opine that, based on the sexual activities described by the victim, "it

would be expected that some transfer of either hairs or seminal fluid would occur."

Id. (emphasis added).  Similarly, Tressel was not permitted to opine that the

forensic evidence did not substantiate the rape claim, or that "there is no forensic

evidence to substantiate the claim of rape."  Id.[11]

_____

> case, it appears that a thorough forensic investigation and a thorough rape examination of the victim in this case were performed.

Def. Ex. 2 at 2.

[11] Specifically, the trial judge ruled that Tressel could not offer testimony based on the following paragraphs of his expert report:

> With the amount of sexual activity described in the search warrant affidavit, it would be expected that some transfer of either hairs or seminal fluid would occur in this case.

> The resulting laboratory findings in this case, do not substantiate the claim of rape through forensic evidence. All findings of the samples that were taken, all of which are essentially routine rape investigation procedures, were negative in finding a transfer of seminal fluid or hair from the defendant in this case. The medical examination of the victim only shows evidence of sexual activity on the part of the victim at some time prior to the examination taking place. The documented finding of bruising around the labia major indicates that the bruising may be substantially older than only a few hours.

> Based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case. The only indication that any type of sexual activity occurred is the redness around the labia major and the redness of the cervix. These two injuries, in and of themselves, can occur during routine normal sexual activity. [The victim's] medical records indicate that she had sexual intercourse on 10/29/2000.

The district court excluded Tressel's proffered opinions about the absence of hair and fluid evidence because it found the opinions to be unreliable. The trial court said that while Tressel was generally qualified as an expert forensic investigator,[12] he had not provided any specific basis -- quantitative, empirical or otherwise -- for his opinions. Precisely because Tressel could not specify in what percentage of cases hair or fluid evidence might reasonably be expected to be recovered, his opinion that the recovery of such evidence "would be expected" would mislead the jury. Simply put, there was no basis for assessing the reliability of Tressel's opinion of what might reasonably be expected, or even its exact meaning.

The district court explained its decision in these terms:

Def. Ex. 2 at 2-3.

[12]The district court explained:

> I think that he's an expert in what you normally look for, and I don't have any difficulty with that. That's where his area of expertise is.
>
> . . . .
>
> I have no problems with his expertise as he is obviously a very qualified criminal investigator, and as to investigative procedures, but that's not the -- if here we were dealing with procedures that were used and whether they were adequate or inadequate, then I would consider him a good expert to testify to those matters.

R5 at 51, 66.

[I]f there is any scientific evidence that shows that in 99 percent of the time you find pubic hair, I would have no problem with that, but he has no study.  He just says that in a very nebulous statement that he used of -- it wasn't generally.  It was commonly found.

Well, this may not be a commonly case.  I have no problem with him saying that's what they're looking for, but I do have a problem with him saying that that's what's found, and if it's not there, I don't believe there was a rape, and I am not going to allow that. . . .

If you have any scientific evidence that would indicate you should [find forensic evidence], I have no problem, as I said, with his testifying that's what they look for, but when you start trying to prove that there is no case because they didn't find it, you have got to have something more than just his opinion.  You need something showing some study.

I have no idea whether -- I don't have enough to tell me how often that is, and I have no basis of knowing, and based upon what you've presented today, I would not and will not allow it.  I don't think that helps the jury. . . .

At most, it's a method of going to the credibility, and I hesitate to start trying to say that a witness is not credible because I would have expected some pubic hair to be found.

I don't know what the percentage is.  Are you going to say then there is a 50 percent chance she's not credible, or there's a 25 percent [chance] or there's a 75 percent [chance] she's not credible[?] I have difficulty with that, and I just don't think that under those circumstances I would admit it.

R5 at 68-70.

The trial judge also excluded Tressel's medical opinions because he was not qualified as a medical expert by background, training or experience. The court explained that it would allow a medical doctor to testify on the issue, but that Tressel's experience and background were simply inadequate.

At trial, Frazier chose not to call Tressel at all, but did clearly establish that no seminal fluid or hair matching Frazier's was recovered during the investigation by calling two FBI laboratory technicians who had worked on the investigation. The defense first called Karen Lanning, an FBI hair and fiber examiner, who testified that she analyzed hair, clothing, and automobile upholstery collected during the Frazier investigation, and that none of the hairs recovered matched Frazier's. On cross-examination, the government asked Lanning how often, in her experience, she found a transfer of hairs. The defense objected, observing that Lanning had been called only as a fact witness, and not as a general expert. The trial judge overruled the objection, after which Lanning testified that she found hair transfers in 10% of the cases she worked on, and found no hair 90% of the time. When the government attempted to question Lanning further about the significance of finding no hair in the case, the defense renewed its objection that Lanning had not been called as an expert. The district court agreed that she had

been called as a fact witness and could not testify on cross-examination as to studies done on hair transfers, sustaining the objection. The government observed that it would call her on rebuttal.

The defense also called Anthony Onorato, a forensic DNA examiner in the FBI's laboratory. Onorato explained that he had received evidence recovered in the Frazier investigation and tested it for the presence of bodily fluids, including blood and seminal fluid. Onorato was unable to identify any semen, nor was he able to identify any blood. On cross-examination, the government sought to question Onorato as to the frequency of finding evidence of semen. Frazier again objected, arguing that the government was seeking to use Onorato as an expert witness. The trial judge stated, "well, that's a factual determination, I will allow that." R9 at 359. Nevertheless, the government ceased this line of cross-examination, observing that it would call Onorato on rebuttal "and do it all at once." Id.

After the defense rested, the government announced that it would call Lanning and Onorato as rebuttal witnesses. Frazier objected, arguing only that the government had failed to give notice of its intent to use Lanning or Onorato as expert witnesses, in violation of Rule 16 of the Federal Rules of Criminal Procedure. The defense suggested that, while the text of Rule 16 referred only to

disclosure requirements for the government's case-in-chief, calling these expert

rebuttal witnesses without notice violated the spirit of the Rule. Frazier suggested,

further, that it would be unfair to allow the government to call these experts to

opine on the significance of the absence of hair or fluid evidence, since Frazier's

expert -- Tressel -- had been precluded from opining on the same subject.[13]

Notably, the defense never objected to the government's use of Lanning or

Onorato on the grounds that either of them was not qualified as an expert, or that

their opinions were based on methodologically unreliable or unsound foundations.

The district court overruled the objection, reasoning that Rule 16 only requires

notice when the government calls an expert during its case-in-chief, and here the

witnesses plainly were called on rebuttal.

On rebuttal, Lanning recited her experience and qualifications, stating that

she was a member of the Midwestern Association of Forensic Scientists and had

testified as an expert forensic scientist more than one hundred times in state and

_____

[13]Frazier objected in the following terms:

> Your honor, I think that it's just wholly unfair for the
> government to attempt to use these witnesses that I've called as fact
> witnesses who were under their control -- Now, the Rule does say in
> their case in chief, but here I think that what the government is doing
> is playing games to avoid [the rule] -- to sandbag the defendants. [sic]

R9 at 359-60.

federal courts across the country. Lanning had worked for six years in the Trace Evidence Unit of the FBI laboratory in Washington, D.C., after previously working for just under six years with the Kansas Bureau of Investigation. Lanning stated that she had never been rejected as an expert by any court, and the government proffered her as an "expert in the area of hair analysis" and forensic investigation, R9 at 369, without objection.

Lanning said that she was familiar with various scientific studies of the rate of hair transfer during sexual contact. She was familiar with a 1990 study by Mary Jacque Mann entitled "Hair Transfers in Sexual Assault" from the Journal of Forensic Sciences which found no pubic hair transfers to the victim's underwear in 97% of the cases involved in the study; no pubic hair transfers in combings of the victim's pubic hair in 96% of the cases; no head hair transfers in the victim's underwear in 96% of the cases; no pubic hair transfers in the victim's outer wear in 98.5% of the cases; and no head hair transfers in the victim's outer wear in 97% of the cases. Lanning also said that she was familiar with a 1998 study in the same journal, entitled "Frequency of Pubic Hair Transfer During Sexual Intercourse," which found no transfer of pubic hairs to the female partners in the study in 82.7% of the cases, and concluded that a failure to transfer pubic hair did not indicate that no intercourse had taken place. Consistent with the latter study, Lanning opined

that the failure to recover any of Frazier's hair did not necessarily mean that no sexual contact had taken place between Frazier and the victim.

On cross-examination, Lanning observed that if sexual contact occurred within an enclosed area, as opposed to an open space, it would be more likely that transferred hairs would remain in that area. She also said that the likelihood of a hair transfer might increase as the duration of the sexual encounter and range of activities increased. Lanning also clarified her earlier testimony that she found hair transfers in 10% of the cases she worked on, specifying that hair was only recovered in between 2% and 5% of the rape cases she worked on.

The government also called Onorato on rebuttal, and elicited that Onorato was a member of the American Academy of Forensic Sciences, the Canadian Society of Forensic Science, and the American Society of Clinical Pathologists. Onorato stated that he had testified as an expert in forensic serological analysis in approximately 15 courts, and was an expert in the search for the presence of semen on evidence. Onorato testified that he had a bachelor's degree in biology and master's degrees in clinical immunology and microbiology as well as in forensic science. Onorato worked for two years in the crime lab of the Pennsylvania State Police, and for approximately two years in the medical center of the University of Alabama at Birmingham, before spending approximately five years in the DNA

24

Analysis Unit of the FBI. The government proffered Onorato as an expert "in the search for the presence of semen on evidence" and forensic investigation, id. at 384, again without objection. Onorato testified that he found semen in materials present in 75% to 80% of the sexual assault cases he worked on. Onorato observed that in a sexual assault where the perpetrator did not ejaculate, the likelihood of recovering semen would be reduced. He also opined that the absence of a defendant's sperm did not necessarily mean that no sexual contact took place.

On cross-examination, Onorato explained that in sexual assault cases where there were multiple erections and penetration over a period of time, the chances of recovering a chemical emitted by the prostate gland, P30, would be increased. Onorato observed that the likelihood of finding bodily fluids in the evidence he examined would increase with the number of sexual encounters.

Following Frazier's trial, on June 20, 2001, the jury rejected his defense and returned a verdict of guilty. Soon thereafter, Frazier was sentenced to a term of life imprisonment without parole, pursuant to the federal "three-strikes" statute, 18 U.S.C. § 3559(c).[14] Frazier timely appealed on August 15, 2001.

---

[14]18 U.S.C. § 3559(c) provides:

> (1) Mandatory life imprisonment.--Notwithstanding any other provision of law, a person who is convicted in a court of the United States of a serious violent felony shall be sentenced to life imprisonment if--

A divided panel of this Court reversed Frazier's conviction, holding that the district court abused its discretion in limiting the testimony of Robert Tressel. The majority found that the district court erroneously required scientific evidence as a prerequisite to expert status, and that by excluding portions of Tressel's testimony it violated the defendant's substantial rights because the heart of the defense turned on undermining the victim's credibility. See United States v. Frazier, 322 F.3d 1262 (11th Cir. 2003). Following the issuance of the panel's opinion, on September 12, 2003, this Court entered an order vacating the panel opinion and directing that the case be heard en banc. See United States v. Frazier, 344 F.3d 1293 (11th Cir. 2003) (en banc).

II.

---

(A) the person has been convicted (and those convictions have become final) on separate prior occasions in a court of the United States or of a State of--

(i) 2 or more serious violent felonies; or

(ii) one or more serious violent felonies and one or more serious drug offenses; and

(B) each serious violent felony or serious drug offense used as a basis for sentencing under this subsection, other than the first, was committed after the defendant's conviction of the preceding serious violent felony or serious drug offense.

18 U.S.C. § 3559(c)(1).

26

We review for abuse of discretion the district court's decisions regarding the admissibility of expert testimony and the reliability of an expert opinion. Joiner, 522 U.S. at 141-43, 118 S. Ct. at 517; see also Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 142, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999) (explaining that, under Joiner, "courts of appeals are to apply 'abuse of discretion' standard when reviewing district court's reliability determination"). Indeed, the "deference that is the hallmark of abuse-of-discretion review," Joiner, 522 U.S. at 143, 118 S. Ct. at 517, requires that we not reverse an evidentiary decision of a district court "'unless the ruling is manifestly erroneous,'" id. at 142, 118 S. Ct. at 517 (quoting Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L. Ed. 487 (1878)). Thus, it is by now axiomatic that a district court enjoys "considerable leeway" in making these determinations. Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176.

This Court has uniformly applied the deferential abuse-of-discretion review that Joiner mandates. See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340 (11th Cir. 2003) (trial court's exclusion of expert testimony reviewed for abuse of discretion; "this standard of review requires that we defer to the district court's evidentiary ruling unless that ruling is manifestly erroneous" (internal quotation marks and citations omitted)); McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) ("[O]ur review of evidentiary rulings

27

by trial courts on the admission of expert testimony is 'very limited.'" (quoting Maiz v. Virani, 253 F.3d 641, 662 (11th Cir. 2001))); Michigan Millers Mut. Ins. Corp. v. Benfield, 140 F.3d 915, 921 (11th Cir. 1998) ("It is very much a matter of discretion with the trial court whether to permit the introduction of [expert] evidence, and we will not reverse the decision of the trial court regarding the exclusion or admission of such evidence unless the trial court's decision is 'manifestly erroneous.'"); see also Toole v. Baxter Healthcare Corp., 235 F.3d 1307, 1312 (11th Cir. 2000) ("We review a trial court's evidentiary rulings on the admission of expert witness testimony for abuse of discretion."); United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999) ("This court reviews the district court's decision to exclude expert testimony under Federal Rule of Evidence 702 for abuse of discretion."); United States v. Gilliard, 133 F.3d 809, 812 (11th Cir. 1998) ("A district court's decision to admit or exclude expert testimony under Rule 702 is reviewed for abuse of discretion.").

The application of an abuse-of-discretion review recognizes the range of possible conclusions the trial judge may reach.

> By definition . . . under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call. That is how an abuse of discretion standard differs from a de novo standard of review. As we have stated previously, the abuse of

discretion standard allows "a range of choice for the district court, so long as that choice does not constitute a clear error of judgment."

Rasbury v. I.R.S. (In re Rasbury), 24 F.3d 159, 168 (11th Cir. 1994) (quoting United States v. Kelly, 888 F.2d 732, 745 (11th Cir. 1989) (citing Kern v. TXO Prod. Corp., 738 F.2d 968, 970 (8th Cir. 1984))); see also Kern, 738 F.2d at 971 ("The very concept of discretion presupposes a zone of choice within which the trial courts may go either way."). Thus, when employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard. Maiz, 253 F.3d at 662.

III.

A.

The starting point for our analysis is Rule 702 of the Federal Rules of Evidence, which controls the admission of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Supreme Court made abundantly clear in Daubert, Rule 702 compels the district courts to perform the critical "gatekeeping" function concerning the

admissibility of expert <u>scientific</u> evidence.  509 U.S. at 589 n.7, 597, 113 S. Ct. at 2795 n.7, 2798.  The trial courts are also required to play the same gatekeeping function considering the admissibility of  <u>technical</u> expert evidence.  <u>Kumho Tire</u>, 526 U.S. at 147, 119 S. Ct. at 1174.  This function "inherently require[s] the trial court to conduct an exacting analysis" of the <u>foundations</u> of expert opinions to ensure they meet the standards for admissibility under Rule 702.  <u>McCorvey</u>, 298 F.3d at 1257.

The importance of <u>Daubert</u>'s gatekeeping requirement cannot be overstated. As the Supreme Court framed it in <u>Kumho Tire</u>: "[t]he objective of that requirement is to ensure the reliability and relevancy of expert testimony.  It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  526 U.S. at 152, 119 S. Ct. at 1176.  The district court's role is especially significant since the expert's opinion "can be both powerful and quite misleading because of the difficulty in evaluating it."  <u>Daubert</u>, 509 U.S. at 595, 113 S. Ct. at 2798 (quoting Jack B. Weinstein, <u>Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended</u>, 138 F.R.D. 631, 632 (1991) ("Weinstein")).  Indeed, no other kind of witness is free to opine about a complicated matter without any firsthand

knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.

Thus, it comes as no surprise that in determining the admissibility of expert testimony under Rule 702, we engage in a rigorous three-part inquiry. Trial courts must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998) (citing Daubert, 509 U.S. at 589, 113 S. Ct. at 2794). While there is inevitably some overlap among the basic requirements -- qualification, reliability, and helpfulness -- they remain distinct concepts and the courts must take care not to conflate them. Quiet Tech., 326 F.3d at 1341.

The proponent of expert testimony always bears "the burden to show that his expert is 'qualified to testify competently regarding the matters he intend[ed] to address; [] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [] the testimony assists the trier of fact.'" McCorvey, 298

F.3d 1253, 1257 (alterations in original) (quoting <u>Maiz</u>, 253 F.3d at 664). The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion, whether the proponent is the plaintiff or the defendant in a civil suit, or the government or the accused in a criminal case.

Turning first to the qualification of the expert, we observe that experts may be qualified in various ways. While scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status. In fact, the plain language of Rule 702 makes this clear: expert status may be based on "knowledge, skill, <u>experience</u>, training, or education." (emphasis added). The Committee Note to the 2000 Amendments of Rule 702 also explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony." Fed. R. Evid. 702 advisory committee's note (2000 amends.).

Of course, the unremarkable observation that an expert may be qualified by experience does not mean that experience, standing alone, is a sufficient foundation rendering reliable <u>any</u> conceivable opinion the expert may express. As we observed in <u>Quiet Technology</u>, "while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability. . . . [O]ur caselaw plainly establishes that one may be

32

considered an expert but still offer unreliable testimony." 326 F.3d at 1341-42.

Quite simply, under Rule 702, the reliability criterion remains a discrete, independent, and important requirement for admissibility.

Indeed, the Committee Note to the 2000 Amendments of Rule 702 expressly says that, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (2000 amends.) (emphasis added); see also Daubert v. Merrell Dow Pharmaceuticals, Inc. (on remand), 43 F.3d 1311, 1316 (9th Cir. 1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). If admissibility could be established merely by the ipse dixit of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Thus, it remains a basic foundation for admissibility that "[p]roposed [expert] testimony must be supported by appropriate validation -- i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 113 S. Ct. at 2795.

As the Supreme Court put it, "the Rules of Evidence -- especially Rule 702 -- . . .

assign to the trial judge the task of ensuring that an expert's testimony . . . rests on

a reliable foundation." Id. at 597, 113 S. Ct. at 2799.

When evaluating the reliability of scientific[15] expert opinion, the trial judge

must assess "whether the reasoning or methodology underlying the testimony is

scientifically valid and . . . whether that reasoning or methodology properly can be

applied to the facts in issue." Id. at 592-93, 113 S. Ct. at 2796. To evaluate the

reliability of scientific expert opinion, we consider, to the extent practicable:

> (1) whether the expert's theory can be and has been tested; (2)
> whether the theory has been subjected to peer review and publication;
> (3) the known or potential rate of error of the particular scientific
> technique; and (4) whether the technique is generally accepted in the
> scientific community.

---

[15] In Daubert, the Court noted that "[s]cience is not an encyclopedic body of knowledge about the universe. Instead, it represents a process for proposing and refining theoretical explanations about the world that are subject to further testing and refinement. . . . [I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." 509 U.S. at 590, 113 S. Ct. at 2795 (internal quotation marks and citation omitted). "[S]cience is a process, a way of examining the natural world and discovering important truths about it. In short, the essence of science is the scientific method." David Goodstein, "How Science Works," Reference Manual on Scientific Evidence 69 (Federal Judicial Center, 2d ed. 2000).

> Scientific evidence encompasses so-called hard sciences (such as physics, chemistry, mathematics and biology) as well as soft sciences (such as economics, psychology, and sociology), and it may be offered by persons with scientific, technical, or other specialized knowledge whose skill, experience, training, or education may assist the trier of fact in understanding the evidence or determining a fact in issue.

William W. Schwarzer & Joe S. Cecil, "Management of Expert Evidence," Reference Manual on Scientific Evidence 39 (Federal Judicial Center, 2d ed. 2000).

Quiet Tech., 326 F.3d at 1341 (citing McCorvey, 298 F.3d at 1256 (citing

Daubert, 509 U.S. at 593-94, 113 S. Ct. at 2796-97)). These factors are illustrative,

not exhaustive; not all of them will apply in every case, and in some cases other

factors will be equally important in evaluating the reliability of proffered expert

opinion.  See  Kumho Tire, 526 U.S. at 150-152, 119 S. Ct. at 1175-76; Fed. R.

Evid. 702 advisory committee's note (2000 amends.); see also Heller v. Shaw

Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999) ("[N]ot only must each stage of the

expert's testimony be reliable, but each stage must be evaluated practically and

flexibly without bright-line exclusionary (or inclusionary) rules.").

The same criteria which are used to assess the reliability of a scientific

opinion may be used to evaluate the reliability of non-scientific, experience-based

testimony.  Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176; see also Clark v.

Takata Corp., 192 F.3d 750, 758 (7th Cir. 1999) ("In determining whether an

expert's testimony is reliable, the Daubert factors are applicable in cases where an

expert eschews reliance on any rigorous methodology and instead purports to base

his opinion merely on 'experience' or 'training.'").  As the Supreme Court

explained in Kumho Tire:

> In certain cases, it will be appropriate for the trial judge to ask, for
> example, how often an engineering expert's experience-based
> methodology has produced erroneous results, or whether such a

method is generally accepted in the relevant engineering community. Likewise, it will at times be useful to ask even of a witness whose expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.

526 U.S. at 151, 119 S. Ct. at 1176. Sometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful. As a result, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Id. at 152, 119 S. Ct. 1176. Exactly how reliability is evaluated may vary from case to case, but what remains constant is the requirement that the trial judge evaluate the reliability of the testimony before allowing its admission at trial. See Fed. R. Evid. 702 advisory committee's note (2000 amends.) ("The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted." (emphasis added)).

The final requirement for admissibility of expert testimony under Rule 702 is that it assist the trier of fact. By this requirement, expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person. See United States v. Rouco, 765 F.2d 983, 995 (11th Cir. 1985) (expert testimony admissible if it offers something "beyond the understanding and experience of the average citizen"). Proffered expert testimony generally will not help the trier of

fact when it offers nothing more than what lawyers for the parties can argue in closing arguments.  See 4 Weinstein's Federal Evidence § 702.03[2][a].

Because of the powerful and potentially misleading effect of expert evidence, see Daubert, 509 U.S. at 595, 113 S. Ct. at 2798, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403.[16]  Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible evidence is substantially outweighed by its potential to confuse or mislead the jury, see Rouco, 765 F.2d at 995, or if the expert testimony is cumulative or needlessly time consuming. See, e.g., Hull v. Merck & Co., Inc., 758 F.2d 1474, 1477 (11th Cir. 1985) (per curiam) (finding that admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R. Evid. 702"); see also United States v. Stevens, 935 F.2d 1380, 1399 (3d Cir. 1991) (finding expert testimony properly excluded because its probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence").

---

[16] Federal Rule of Evidence 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

Indeed, "the judge in weighing possible prejudice against probative force under Rule 403 . . . exercises more control over experts than over lay witnesses." Weinstein, 138 F.R.D. at 632; see also Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 1122, 8 L. Ed. 2d 313 (1962). Simply put, expert testimony may be assigned talismanic significance in the eyes of lay jurors, and, therefore, the district courts must take care to weigh the value of such evidence against its potential to mislead or confuse.

### B.

The application of these basic principles yields the conclusion that the district court did not abuse its discretion (that is, commit manifest error) in excluding certain portions of Tressel's proposed expert testimony.

We begin by observing that the first requirement, qualification, is satisfied here. Based on his training and experience as a forensic investigator, Tressel was qualified as an expert in forensic investigations. In fact, the trial judge acknowledged as much during the Daubert hearing. The district court said: "I think that he's an expert in what you normally look for [in a rape investigation], and I don't have any difficulty with that. That's where his area of expertise is." R5 at 51. Later, the trial judge reiterated this point, observing: "I have no problems with his expertise as he is obviously a very qualified criminal

38

investigator . . . . [I]f here we were dealing with procedures that were used and whether they were adequate or inadequate, then I would consider him a good expert to testify to those matters." Id. at 66. Tressel's qualification as an expert forensic investigator was based on his experience with the Police Department of Cobb County, Georgia, and within the Cobb County Medical Examiner's Office. Were Tressel's qualification as an expert the only prerequisite to the admissibility of all his opinion testimony, we have little doubt that he would be competent to testify generally as an expert forensic investigator.[17]

Frazier argues, however, that the district court erroneously treated scientific background as a prerequisite to expert status, and we agree that, had the court done so, it would have erred as a matter of law, because Rule 702 expressly contemplates that experts may be qualified based on experience. However, our review of the entire record suggests that the district court excluded Tressel's testimony not because he lacked a scientific background, but because he failed to establish that his opinions were methodologically reliable or sound.

---

[17]While the district court found Tressel qualified as an expert forensic investigator, it reached the opposite conclusion concerning his qualification to offer medical opinions. The trial judge said that "I am not going to allow him to testify about the bruising [to the victim's genital area]. I would [allow] a medical doctor but not a witness with these credentials." R5 at 50-51. Frazier does not appeal the district court's ruling that Tressel was not qualified to offer expert medical testimony. We add that evidence of bruising to genitalia, just like hair and bodily fluids, may be forensic evidence of a sexual assault.

Two factors support our conclusion that the district court did not exclude Tressel's testimony because he lacked scientific expertise or was otherwise unqualified. First, as we have noted, the trial court explicitly said that Tressel was qualified by experience as an expert forensic investigator. Second, the district court allowed FBI investigators Lanning and Onorato to offer expert opinions after they were qualified as experts based in substantial measure on their experience.[18] The record taken as a whole indicates that the district court properly understood that experience can provide a basis for qualifying an expert. And we discern no abuse of discretion in the district court's conclusion that Tressel was a qualified forensic investigator.

We turn then to the central issue on appeal: whether the district court abused its discretion by excluding some of Tressel's opinion testimony because he failed to establish its reliability. We reiterate that the district court has the same broad discretion in deciding how to assess the reliability of expert testimony that it has in

---

[18]As detailed, supra, Lanning had worked for just under six years with the Kansas Bureau of Investigation, and for six years in the Trace Evidence Unit of the FBI laboratory in Washington, D.C.; she was a member of the Midwestern Association of Forensic Scientists and had testified as an expert forensic scientist more than a hundred times. Onorato had worked in the University of Alabama at Birmingham's medical center for approximately two years, and in the crime lab of the Pennsylvania State Police for two years, before joining the FBI, where he had worked for approximately five years at the time of the trial. Onorato also had experience as a member of the American Academy of Forensic Sciences, the Canadian Society of Forensic Science, and the American Society of Clinical Pathologists, and qualified as a court expert in approximately 15 cases.

its ultimate reliability determination. In this case, after the government moved to exclude Tressel's testimony, the district court assessed the reliability of his opinions by conducting a thorough <u>Daubert</u> hearing in which Tressel was asked, repeatedly, what the bases for his opinions were. While some expert testimony will be so clearly admissible that a district court need not conduct a <u>Daubert</u> hearing in every case, <u>see</u> <u>Kumho Tire</u>, 526 U.S. at 150-52, 119 S. Ct at 1175-76, in this case, the district court's decision to evaluate the admissibility of Tressel's opinions in the context of a pre-trial hearing was a perfectly reasonable one. Moreover, Frazier has not attacked the timing or conduct of the <u>Daubert</u> hearing. And the record amply establishes that Frazier was afforded every opportunity at the hearing to adduce the foundations of Tressel's challenged opinions. The district court did not abuse its discretion when it conducted a <u>Daubert</u> hearing.

The reliability of Tressel's opinion that the recovery of inculpatory hair or seminal fluid "would be expected" is undermined in two ways. First, the very meaning of his basic opinion is uncertain. Whether Tressel opined that "expect," as he used the term, meant that it was <u>more likely than not</u> that trace evidence would be found, or that it was <u>substantially more likely than not</u> that it would be found if there was a sexual assault, or that discovery was a <u>virtual certainty</u>, is altogether unclear from Tressel's report or his testimony. The specific meaning of

41

the opinion is impossible to discern. As the government pointed out at oral argument, even the dictionary definition of the term "expect" -- meaning to consider something either likely or certain -- is itself ambiguous, and could imply a likelihood anywhere between 50% and 100%. See Webster's Third International Dictionary 799 (1961) (defining "expect" as "to consider probable or certain").

More fundamentally, even if we take Tressel's opinion to mean simply that it was more likely than not that hair or seminal fluid would be transferred, and therefore recovered, Tressel offered precious little in the way of a reliable foundation or basis for his opinion. After the government moved to exclude Tressel's expert testimony, the district court was obliged to exercise its gatekeeping role by determining whether Tressel provided a reliable foundation or basis for his opinion. When questioned specifically about the basis for his opinion, Tressel said his opinion was based on his experience, and on various texts in forensic investigation. However, even after repeated prompting, Tressel never explained just how his own experience, or the texts he mentioned, supported his "expectancy" opinion. Indeed, Tressel identified only a single investigation he had worked on in which hair evidence was recovered during the investigation of a serial rapist, and could suggest no study that had ever examined the rate of transfer of hair in sexual assault cases.

42

While the expert's statement that the recovery of hair or seminal fluid "would be expected" expresses an intrinsically probabilistic or quantitative idea, the probability it expresses is unclear, imprecise and ill-defined. And the basis for that probabilistic opinion is left unstated. Without knowing how frequently hair or seminal fluid is transferred during sexual conduct in similar cases -- whether derived from reliable studies or based on some quantification derived from his own experience -- it would be very difficult indeed for the district court (or for that matter the jury) to make even an informed assessment, let alone to verify that the recovery of hair or fluid evidence in this case "would be expected." Nor could the district court tell from Tressel's testimony whether his opinions had been subjected to peer review or, even, the percentage of cases in which his opinion had been erroneous. Simply put, Tressel did not offer any hard information concerning the rates of transfer of hair or fluids during sexual conduct.

Since Tressel was relying solely or primarily on his experience, it remained the burden of the proponent of this testimony to explain how that experience led to the conclusion he reached, why that experience was a sufficient basis for the opinion, and just how that experience was reliably applied to the facts of the case. Again, "[t]he court's gatekeeping function requires more than simply 'taking the

expert's word for it.'" Fed. R. Evid. 702 advisory committee's note (2000 amends.).

Our review of this record leads us to the conclusion that the district court did not abuse its discretion in finding the absence of a sufficiently verifiable, quantitative basis for Tressel's opinion.[19]  As we have noted, the application of an abuse-of-discretion standard recognizes a range of possible conclusions that the trial judge  may reach.  In this case, we are satisfied that the district judge acted well within that range in finding an insufficient nexus between the experience proffered by the expert and the essential opinion propounded.

Turning finally to the third requirement for admissibility of expert opinion testimony -- whether it will assist the trier of fact in understanding the evidence -- the district court also concluded that  Tressel's opinion regarding "expectation" would not aid the jury.[20]  Again, because Tressel's opinion was imprecise and

---

[19]Tressel's other opinion -- that there was no forensic evidence to substantiate the rape -- plainly was premised on his basic opinion that "it would be expected that some transfer" of hair or seminal fluid would occur in this case.  Accordingly, if the district court did not abuse its discretion, that is, commit manifest error, in excluding the opinion concerning "expectancy," then it did not (nor on this record could it) commit manifest error in excluding the derivative opinion either.

[20]We read the record to suggest that the district court concluded Tressel's ambiguous "expectation" opinion would not aid the jury, although the court's statements are, on this point, not altogether clear.  The court said:

I have no problem, as I said, with his testifying that's what they look for, but when you start trying to prove that there is no case because they didn't find [trace evidence], you have got to have something more than just his opinion. . . .

44

unspecific, the members of the jury could not readily determine whether the "expectation" of finding hair or seminal fluid was a virtual certainty, a strong probability, a possibility more likely than not, or perhaps even just a possibility. As a result, Tressel's imprecise opinion easily could serve to confuse the jury, and might well have misled it. More importantly, as we have noted, the methodological foundation or reliability of Tressel's "expectancy" opinion was sufficiently slender to allow the district court to conclude that the trier of fact would not be <u>assisted</u> by the opinion. In short, we can discern no abuse of discretion (let alone manifest error) in the trial court's finding that the third prong of Rule 702 had not been met either.[21]

---

> I have no idea whether -- I don't have enough to tell me how often that is, and I have no basis of knowing, and based upon what you've presented today, I would not and will not allow it. <u>I don't think that helps the jury</u>.

R5 at 69 (emphasis added).

[21]Moreover, even if the district court had abused its discretion in excluding portions of Tressel's opinion testimony -- and on this record we find no abuse of discretion -- any such error would have been harmless.

Evidentiary decisions do not constitute reversible error "unless a substantial right of the party is affected," Fed. R. Evid. 103(a), and errors that do not "affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). In a case involving non-constitutional evidentiary errors, we read these rules of evidence and criminal procedure along with the federal harmless-error statute, 28 U.S.C. § 2111, which requires that "the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." See United States v. Guzman, 167 F.3d 1350, 1353 (11th Cir. 1999); United States v. Hernandez, 160 F.3d 661, 670 (11th Cir. 1998); United States v. Lankford, 955 F.2d 1545, 1556 (11th Cir. 1992); United States v. Sellers, 906 F.2d 597, 601 (11th Cir. 1990). Errors do affect a substantial right of a party if they have a "substantial influence" on the outcome of a case or leave "grave doubt" as to

whether they affected the outcome of a case. Kotteakos v. United States, 328 U.S. 750, 764-65, 66 S. Ct. 1239, 1248, 90 L. Ed. 1557 (1946). The exclusion of a portion of Tressel's opinion testimony, even if erroneous, did not affect Frazier's substantial rights.

As we've repeated, the substance of the excluded portions of Tressel's testimony was presented to the jury through the testimony of other witnesses. Frazier argued vigorously that the lack of hair and fluid evidence meant that there had been no rape and therefore no abduction. We reiterate that the district court did not exclude all of Tressel's testimony. Indeed, it allowed him to testify that a thorough investigation was performed; that no inculpatory evidence was recovered; that hair is the evidence "most commonly found" in rape investigations; and that seminal fluids are "frequently found in sexual assault cases," especially when (as in this case) there is a claim that multiple episodes of sexual activity occurred and no condom was used. Whatever impact the failure to present this evidence through Tressel had on the outcome of the trial, Frazier cannot now complain that his rights were violated, since it was his decision, not a ruling by the trial judge, that kept Tressel from testifying at all.

Moreover, the excluded portion of Tressel's opinion testimony was offered as secondary evidence targeted solely at impeaching the victim's credibility on her claim of rape, rather than being offered as substantive evidence relating to Frazier's guilt or innocence on the kidnapping charge. The excluded opinion testimony related to whether Frazier raped the victim, not whether he kidnapped her. Cf. United States v. Burroughs, 830 F.2d 1574, 1578-80 (11th Cir.1987) (effect of withholding impeachment evidence not sufficiently prejudicial to merit new trial where sufficient evidence of substantive guilt was presented and government's witness was impeached through other means). Nor was Frazier prevented from impeaching the victim's credibility through other means, and indeed, he took ample advantage of other opportunities to do so. The defense sought to undermine the credibility of the victim's account of kidnapping and rape by, among other things, presenting evidence that she did not appear to be upset or afraid when she accompanied the defendant when he purchased gasoline and cigarettes, nor, notably, did she try to escape; that she lit a cigarette for Frazier while in the car; and that she did not initially tell police she had been raped immediately after being removed from her car. Evidence was also offered establishing that the victim was calm and did not appear upset when she was taken to the hospital. This evidence, when combined with the undisputed presentation of facts that neither the defendant's hair nor semen were found on the victim's person or in her car, provided Frazier ample opportunity to present to the jury his basic defense that the victim had manufactured the entire account of abduction and rape.

Finally, the exclusion of some of Tressel's opinion testimony (even if error) was harmless because the other evidence of Frazier's guilt was so substantial. See United States v. Fortenberry, 971 F.2d 717, 722 (11th Cir. 1992). The defendant's own account of the night in question was patently incredible and unbelievable, and Frazier's account itself constituted substantive evidence of his guilt. See United States v. Bennett, 848 F.2d 1134, 1139 (11th Cir. 1988) (observing that "a defendant's implausible explanation may constitute positive evidence in support of a jury verdict," and that where the defendant's story was "dubious, if not wholly incredible . . . [a] reasonable jury

might well disbelieve the explanation and conclude that the [defendant was] lying in an attempt to cover up illegal activities"). After his arrest, Frazier told the FBI that, after drinking beer all day (indeed, after finishing off three 12-packs of beer by 6:00 that evening), he was sitting on a bench in a Wal-Mart parking lot, when he was approached by an 18-year-old woman who was a complete stranger, and who initiated a conversation with him, offering to give him a ride home. Frazier claimed that, after driving out of the parking lot, the victim asked him to drive for awhile, in spite of the fact that he was intoxicated and had told her he had no valid driver's license. The defendant also claimed that he did not pull over when her father tried to flag him down, and when the police joined the lengthy, high-speed chase, because the victim directed him to do so. Plainly, the jury could find this account wholly implausible.

Even leaving aside Frazier's own dubious explanation of the events that Halloween night, there was other substantial evidence from which the jury inferred his guilt. Frazier entered the vehicle at Wal-Mart on the driver's side and sat in the rear seat directly behind the victim, an action consistent with an abduction under the threat of violence. Indeed, if the victim had volunteered to give Frazier a ride, he likely would have sat in the front passenger seat. In addition, Frazier was arrested carrying a knife locked in the open position, a development wholly consistent with the victim's account. We add that, given his intoxicated state, the very fact that he was driving suggested he took control of the car by force and against the victim's will. Finally, and perhaps most importantly, Frazier's long and harrowing flight from the police -- at speeds up to 100 miles per hour -- was strong evidence of consciousness of guilt, as this Court has repeatedly held. See, e.g., United States v. Blakey, 960 F.2d 996, 1000 (11th Cir. 1992) (evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt itself); United States v. Beard, 775 F.2d 1577, 1581 (11th Cir. 1985) (evidence of flight can raise inference of consciousness of guilt); Monnette v. United States, 299 F.2d 847, 851 (5th Cir. 1962) (flight from law enforcement officers is evidence of guilt).

Thus, given the substantial evidence presented at trial from which Frazier's guilt could be inferred, and the exculpatory hair and semen testimony actually presented, we find it exceedingly remote that the jury's verdict would have been different even if Tressel's "expectancy" opinion had been admitted. Its exclusion did not have a substantial impact on the outcome of the case, nor are we left with grave doubt that the case's outcome was affected. Any claimed error was harmless. See, e.g., United States v. Darwin, 757 F.2d 1193, 1204 (11th Cir. 1985); United States v. Vesey, 338 F.3d 913, 918 (8th Cir. 2003); United States v. Smith, 736 F.2d 1103, 1108 (6th Cir. 1984).

47

IV.

A.

Frazier also claims that the district court's decision to permit the testimony of FBI investigators Lanning and Onorato -- while at the same time excluding some of Tressel's opinion -- was a fatal error. We remain unpersuaded.

Frazier makes three broad arguments in support of this claim. First, he says that the government's failure to provide notice of its intent to call Lanning and Onorato violated the spirit and purpose of Rule 16 of the Federal Rules of Criminal Procedure. Next, Frazier suggests that it was improper for the district court to allow the government to use Lanning and Onorato as rebuttal witnesses. Having excluded Tressel's testimony, Frazier argues, there was nothing for Lanning and Onorato to rebut. Finally, Frazier maintains that it was simply unfair to allow the government to present evidence -- through Lanning and Onorato -- on the very issue he was unable to offer evidence from Tressel.[22]

_____

[22]On appeal, Frazier has raised a fourth claim. He says that the trial court made no pre-trial determination that Lanning and Onorato were qualified as experts, or for that matter, that their opinions were reliable. However, at trial Frazier never objected to the testimony of Lanning and Onorato as being unreliable, and never challenged their expert qualifications. Absent some objection from Frazier as to the qualifications of Lanning and Onorato, or concerning the reliability of their opinions, we review only for plain error the district court's implicit determination that they were qualified and their opinions were reliable. See Christopher v. Cutter Labs., 53 F.3d 1184, 1192 (11th Cir. 1995) (absent objection to expert's testimony, court of appeals reviews challenged testimony only for plain error); see also Macsenti v. Becker, 237 F.3d 1223, 1231-32 (10th Cir. 2001) (decision to admit expert testimony reviewed only for plain error when timely objections under Daubert are

48

At trial, Frazier's primary objection was that, absent notice, allowing the testimony of Lanning and Onorato violated Rule 16 of the Federal Rules of Criminal Procedure. The pertinent portion of Rule 16 provides:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence <u>during its case-in-chief</u> at trial.

Fed. R. Crim. P. 16(a)(1)(G) (emphasis added). Our case law establishes that, consistent with the plain language of the Rule, the government's presentation of <u>rebuttal</u> testimony without prior notice does not violate Rule 16, since the Rule's

not made); <u>McKnight v. Johnson Controls, Inc.</u>, 36 F.3d 1396, 1406-07 (8th Cir. 1994); 4 <u>Weinstein's Federal Evidence</u> § 702.02[6][a] ("In the absence of an objection, rulings admitting or excluding expert testimony without a reliability determination are reviewable only for plain error.").

It is true that the trial judge did not make an explicit determination on the record as to Lanning's and Onorato's qualifications, or concerning the reliability of their opinions, and doing so may have been the better course here. Nevertheless, we are not persuaded that the district court, when <u>faced with no objection</u>, was obliged to formally memorialize its determinations regarding qualifications and reliability on the record. <u>See</u>, <u>e.g.</u>, <u>United States v. Locascio</u>, 6 F.3d 924, 938-39 (2d Cir. 1993). Here, then, we examine the district court's implicit rulings that Lanning and Onorato were qualified and their opinions were reliable for plain error. We find plain error only where (1) there is an error; (2) the error is plain or obvious; (3) the error affects the defendant's substantial rights in that it was prejudicial and not harmless; and (4) the error seriously affects the fairness, integrity, or public reputation of a judicial proceeding. <u>See</u> <u>United States v. Chisholm</u>, 73 F.3d 304, 307 (11th Cir. 1996).

After reviewing the testimony offered by experts Lanning and Onorato, we conclude that the district court did not commit plain error in failing to exclude their testimony because they were unqualified or because their opinions were unreliable. As discussed <u>supra</u>, both Lanning and Onorato demonstrated expert qualifications before offering any opinions, and provided specific and detailed quantitative bases for their opinions, in marked contrast to Tressel. There was no error, let alone one that was plain or obvious. Moreover, we can discern nothing that calls into question the fairness, integrity, or reputation of the judicial proceeding.

49

notice requirements apply only to the government's case-in-chief.  See United

States v. Windham, 489 F.2d 1389, 1392 (5th Cir. 1974) ("Rebuttal witnesses are

a recognized exception to all witness disclosure requirements.");[23] see also United

States v. DiCarlantonio, 870 F.2d 1058, 1063 (6th Cir. 1989) (Rule 16 does not

require disclosure of expert rebuttal testimony not offered during government's

case-in-chief); United States v. Barrett, 766 F.2d 609, 617 (1st Cir. 1985) (same);

United States v. Angelini, 607 F.2d 1305, 1308-09 (9th Cir. 1979) (same).  Thus,

so long as this testimony was properly characterized as rebuttal, Rule 16 did not

require the government to give notice or a summary of the testimony.

Frazier argues, nevertheless, that the testimony of Lanning or Onorato is not

rebuttal because Tressel's testimony was excluded and, thus, there were no

opinions for them to contradict.  We disagree.  We have explained that "[t]he

purpose of rebuttal evidence is 'to explain, repel, counteract, or disprove the

evidence of the adverse party,' and the decision to permit rebuttal testimony is one

that resides in the sound discretion of the trial judge."  United States v. Gold, 743

F.2d 800, 818 (11th Cir. 1984) (quoting United States v. Delk, 586 F.2d 513, 516

(5th Cir. 1978)); see also Luttrell v. United States, 320 F.2d 462, 464 (5th Cir.

---

[23] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

1963) ("'It is within the distinct office of rebuttal to explain, repel, counteract, or disprove the evidence of the adverse party.'" (quoting <u>Shepard v. United States</u>, 64 F.2d 641, 642 (10th Cir. 1933))).

During his case-in-chief, Frazier's counsel called Lanning and Onorato (instead of Tressel) in order to establish that <u>no</u> hair or fluids matching Frazier's were found at the scene of the crime, after suggesting in opening statement that the absence of this evidence meant that no sexual assault had taken place, and therefore that the victim's accounts of abduction and assault were not credible.[24]

---

[24] In her opening statement, Frazier's counsel explained that the defense hinged on attacking the credibility of the victim's story by suggesting, among other things, that the failure to recover hair or fluid evidence implied the victim was lying. She said:

> [I]n the end what it comes down to is going -- it's going to be -- your decision is going to be based on whether or not you believe [the victim] or don't believe [the victim].
>
> . . . .
>
> Now, as we all know from common sense the -- if there has been a sexual encounter, the lengthier the encounter, the more contained the area, the more likely there is going to be some transfer of hair, some transfer of body fluids, things that for you as jurors are important because if they exist, if they can be corroborated, it corroborates [the victim's] version of what happened. . . .
>
> And after the fact . . . nothing is recovered that corroborates [the victim's] description of what happened.
>
> . . . I submit to you . . . that when you hear all of the evidence in this case . . . you will have not just a reasonable doubt, you will have a substantial doubt about what [the victim] has told you happened on Halloween night last year.

R7 at 79-81.

The government offered the rebuttal testimony of Lanning and Onorato to explain and attempt to counteract the viewpoint that the absence of finding hair or seminal fluid meant no sexual assault had occurred.

We add that by introducing the fact that the investigators had failed to recover any inculpatory hairs or bodily fluids, and arguing the significance of that failure, Frazier plainly opened the door for the government to offer reliable evidence that could help explain the significance of that failure. He cannot now complain that the government stepped through that door and rose to the challenge he presented. See United States v. Hall, 653 F.2d 1002, 1006 (5th Cir. Unit A Aug. 1981) ("The underlying rationale [of rebuttal evidence] is that when the defendant has opened the door to a line of testimony by presenting evidence thereon, he cannot object to the prosecution's accepting the challenge and attempting to rebut the proposition asserted." (citing Delk, 586 F.2d at 516)). This was the purpose animating the government's use of Lanning's and Onorato's testimony, and the district court did not abuse its discretion in allowing the testimony of Lanning and Onorato on rebuttal. No violation of Rule 16 has been established on this record.

Frazier also argues that, regardless of whether there was any violation of the terms of Rule 16, it was unfair to allow Lanning and Onorato to testify because

Tressel was not permitted to testify on the same point. Frazier says that if the government was allowed to present evidence on an issue, he too should have been afforded the same opportunity to do so. Frazier relies on United States v. Gaskell, 985 F.2d 1056 (11th Cir. 1993) for the proposition that a district court may abuse its discretion when it excludes one party's testimony on a critical issue while allowing the other party to present evidence on the same issue.

Gaskell is inapposite and Frazier's reliance upon it is misplaced. In Gaskell, a panel of this Court ruled that the district court erred by excluding the expert testimony of one party while allowing the other party to present expert testimony on the same issue. However, in Gaskell, the district court's reason for excluding the testimony was the lack of relevance. We held that if testimony for one party was relevant, testimony for the other party on the same issue would be relevant and, if otherwise admissible, should not be excluded. See Gaskell, 985 F.2d at 1063 ("Any doubt as to the relevance of this evidence should have been resolved in favor of Gaskell in light of the fact that the government's expert was allowed to opine [on the same subject]. 'It is an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.'" (quoting United States v. Lankford, 955 F.2d 1545, 1552 (11th Cir.1992) (emphasis added))).

53

Here, however, the government has not disputed that Tressel's testimony was <u>relevant</u>; rather, it objected and the district court ruled that <u>some</u> of Tressel's opinion testimony was not <u>reliable</u>, and for that reason inadmissible. Because the district court did not abuse its discretion in finding the opinion unreliable, <u>Gaskell</u> does not illuminate this case.

B.

Nor are we persuaded by Frazier's broader claim that the aggregate effect of the district court's evidentiary rulings was to deny him "a meaningful opportunity to present a complete defense." <u>California v. Trombetta</u>, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984).

It is surely true that a defendant must be afforded the opportunity to present a defense. Indeed, the right of the accused to assert a complete defense is well established, and has its roots in the Fifth, Sixth, and Fourteenth Amendments to the Constitution. The Supreme Court has explained:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard.

Crane v. Kentucky, 476 U.S. 683, 690, 106 S. Ct. 2142, 2146-47, 90 L. Ed. 2d 636 (1986) (internal quotation marks and citations omitted). As the Court observed in Chambers v. Mississippi: "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." 410 U.S. 284, 302, 93 S. Ct. 1038, 1049, 35 L. Ed. 2d 297 (1973).

While the Constitution unquestionably provides a defendant with the right to be heard, this right is not unbounded. Thus, "[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410, 108 S. Ct. 646, 653, 98 L. Ed. 2d 798 (1988). A trial would not be considered unfair because the defendant was prevented from offering perjured testimony. See Nix v. Whiteside, 475 U.S. 157, 173, 106 S. Ct. 988, 997, 89 L. Ed. 2d 123 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying falsely."); Harris v. New York, 401 U.S. 222, 225, 91 S. Ct. 643, 645, 28 L. Ed. 2d 1 (1971). Nor are an accused's constitutional rights necessarily violated because he was prevented from introducing hearsay, see United States v. Pena, 527 F.2d 1356, 1362 (5th Cir. 1976), or from presenting otherwise relevant evidence that is privileged, such as communications between a doctor and patient, a lawyer and client, or between a

husband and wife, see United States v. Brown, 634 F.2d 819, 830 (5th Cir. 1981) ("The district court did not violate either [the defendant's] Sixth Amendment right to confront the witnesses against him or his Fifth Amendment right to due process of law when it upheld [the] claim of marital privilege as a bar to the . . . testimony."). And courts may constitutionally preclude defendants from offering otherwise relevant evidence if they fail to comply with procedural rules that require notice to be given. See Michigan v. Lucas, 500 U.S. 145, 152-53, 111 S. Ct. 1743, 1748, 114 L. Ed. 2d 205 (1991); Taylor, 484 U.S. at 417, 108 S. Ct. at 657. Thus, for example, a district court may constitutionally preclude an accused from calling an alibi witness if he has failed to disclose the witness, as required under Rule 12.1 of the Federal Rules of Criminal Procedure. See, e.g., Williams v. Florida, 399 U.S. 78, 81-82, 90 S.Ct. 1893, 1896, 26 L. Ed. 2d 446 (1970) (finding analogous state notice-of-alibi rule constitutional).

As the Supreme Court observed in Chambers, the accused, just like the state, "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." 410 U.S. at 302, 93 S. Ct. at 1049; see also Crane, 476 U.S. at 690, 106 S. Ct. at 2146; United States v. Scheffer, 523 U.S. 303, 308, 118 S. Ct. 1261, 1264, 140 L.

Ed. 2d 413 (1998); <u>Rock v. Arkansas</u>, 483 U.S. 44, 55-56, 107 S. Ct. 2704, 2711, 97 L. Ed. 2d 37 (1987).

A policy which aims at preventing the use of unreliable or misleading expert evidence in criminal trials is far from arbitrary. Accordingly, a court may constitutionally enforce evidentiary rules to limit the evidence an accused (or for that matter any party) may present in order to ensure that only reliable opinion evidence is admitted at trial. "The Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system; one cannot invoke the Sixth Amendment as a justification for presenting what might have been a half-truth." <u>United States v. Nobles</u>, 422 U.S. 225, 241, 95 S. Ct. 2160, 2171, 45 L. Ed. 2d 141 (1975); <u>see</u> <u>also</u> <u>United States v. Nixon</u>, 418 U.S. 683, 709, 94 S. Ct. 3090, 3108, 41 L. Ed. 2d 1039 (1974) ("The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence.").

While the Federal Rules of Evidence -- notably Rule 702 -- aim to ensure that the fact-finder weighs only sound and reliable evidence, it is also worth repeating that a district court's exercise of its gatekeeping responsibilities must not

"supplant the adversary system or the role of the jury." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311 (11th Cir. 1999); see also United States v. 14.38 Acres of Land, More or Less Situated in Leflore County, Miss., 80 F.3d 1074, 1078 (5th Cir. 1996) ("[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system . . . ."). As the ultimate fact-finder, it is the jury that must determine, finally, where the truth in any case lies, and the district judge as gatekeeper may not usurp this function. See Fed. R. Evid. 102 ("These rules shall be construed . . . to the end that the truth may be ascertained and proceedings justly determined."); Nix, 475 U.S. at 171, 106 S. Ct. at 996 (explaining that "governance of trial conduct" should aim at "what we have long called 'a search for truth'"). However, the trial judge's role as gatekeeper is designed to ensure that the jury, in carrying out its prescribed role, bases its determinations on relevant and reliable evidence, rather than on speculation or otherwise unreliable conjecture. These bedrock principles establish that, while a criminal defendant must be given every meaningful opportunity to present a complete defense, in doing so he must comply with the procedural and evidentiary rules designed to facilitate a search for the truth.

Turning to the case at hand, Frazier's right to put on a meaningful defense did not include the unfettered and unreviewable opportunity to present all expert

opinion, even if it did not meet the basic requirements for admissibility found in Rule 702. See Taylor, 484 U.S. at 410-11, 108 S. Ct. at 653-54. And we have found that the district court acted well within its discretion in excluding some of Tressel's opinions.

Moreover, Frazier's view that the exclusion of Tressel's testimony denied him a fundamentally fair trial must also fail because, as we've noted, the essence of Tressel's proposed testimony was admitted at trial through alternative means. The basis for Tressel's expectancy opinion -- that no transferred hair or fluid evidence inculpating Frazier in the sexual assault was recovered -- was actually admitted at trial through the testimony of FBI examiners Lanning and Onorato. Tressel's opinion that the recovery of hair or semen would be expected was argued vigorously to the jury by Frazier's counsel, who contended that the lack of evidence suggested the victim's story of rape had been manufactured, and maintained that if the victim's account of the sexual assault could not be believed, then the jury could not believe her statement that she was kidnapped as well.

In short, the district court's exclusion of some portions of Tressel's opinion testimony did not prevent Frazier from introducing the key elements of his defense and placing his story before the jury. See Sheffield, 992 F.2d at 1170.

59

## V.

After painstaking review of this record we are satisfied that the district court did not abuse its discretion, that is commit manifest error, in excluding a portion of Tressel's opinion testimony while allowing the government's rebuttal evidence on the same issue. Nor, finally, was this defendant denied a fair trial. Accordingly, we affirm.

**AFFIRMED**.

TJOFLAT, Circuit Judge, specially concurring:

The critical issues in this appeal concern evidentiary rulings. Frazier contends that the district court abused its discretion when it barred his expert, Robert Tressel, from expressing his opinions (1) that "there is no forensic evidence to substantiate the claim of rape in this case," and (2) that, if the victim's claim of rape were true, "it would be expected that some transfer of either hairs or seminal fluid would [have] occur[red]." Frazier also challenges the court's decision to permit two FBI forensic investigators, Karen Lanning and Anthony Onorato, to testify on rebuttal that the absence of hairs and seminal fluid does not mean that no rape occurred. I concur in the court's holding that the district court did not abuse its discretion in overruling Frazier's objection to Lanning's and Onorato's testimony.[1] I also concur in the court's affirmance of the district court's rejection of Tressel's opinions. The analytical model I use in reaching this result, however, differs from the model the court uses. Because the difference is significant, an explanation is in order.

---

[1] I also agree with the court's conclusion that Frazier failed to object at trial to Lanning and Onorato's opinions on the ground that they were unreliable and therefore inadmissible under Federal Rule of Evidence 702. See ante at 53 n.21. Finally, I agree with the court that if examined for plain error, the district court's failure to determine sua sponte whether these opinions are reliable does not satisfy the first element of plain error: that an error occurred. Id. I cannot imagine a situation in which a court of appeals would hold that a district court has a duty to intervene on its own initiative and convene a Daubert hearing for the purpose of ascertaining whether an about-to-be-introduced expert opinion is reliable.

I.

A.

I begin by observing what happens after a party objects to the introduction

of an expert witness's opinion on the ground that the opinion is unreliable.[2]

Assume that the party explains why the opinion is unreliable,[3] that the explanation

may have merit, and that the court, recognizing this possibility, convenes a

Daubert hearing.[4]  Whether the proffered opinion is reliable is a question of fact.

---

[2]  In the following hypothetical scenario, I assume that the expert is "qualified" and that the proffered opinion is relevant—that is, it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.  Thus, I focus solely on the issue of reliability.

[3]  In a criminal case, if the defendant, invoking his right under Federal Rule of Criminal Procedure 16(a)(1)(G), has obtained "a written summary of any testimony that the Government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence," the defendant should be in a position to support his objection to the opinion of a government expert with an explanation of why he believes the opinion is unreliable.  Under this scenario, the government would be entitled to reciprocal discovery under Federal Rule of Criminal Procedure 16(b)(1)(C)(i) and thus should be able to explain why it objects to the reliability of a defense expert's opinion.  When, however, the opinion of an expert witness is proffered in rebuttal, the objecting party may not be able articulate specific reasons for believing the opinion to be unreliable.  In this case, for example, because the Government called Lanning and Onorato in rebuttal, Frazier had not obtained summaries of their testimony or the bases for any opinions they might express.  Consequently, he could not have been expected to provide a specific ground for objecting to their opinions.  Nonetheless, as the court's opinion points out, see ante at 53 n.21, Frazier made no objection based on Rule 702; his sole objection to Lanning and Onorato's testimony was based on his misguided argument that Rule 16 required the Government to give him prior notice of what their testimony would be.  The court therefore had no obligation to hold a Daubert hearing before the Government elicited the testimony at issue.

[4]  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); see also Kumho Tire Co. v. Carmichael, 526 U.S.137, 119 S. Ct. 1167, 1175, 143 L. Ed. 2d 238 (1999) (holding Rule 702 imposes an obligation upon federal trial courts to ensure

It is an ultimate fact not susceptible to direct proof, so it must be inferred from certain circumstantial facts, which the Supreme Court has referred to as "factors."[5] The proponent of the opinion has the burden of establishing the ultimate fact of reliability by a preponderance of the evidence.[6] The proponent satisfies that burden by establishing to the trial court's satisfaction circumstantial facts sufficient to yield the inference that the opinion is reliable.

If the proponent does this, and the court thereafter finds the opinion reliable, the court must admit the opinion unless it concludes that, though relevant and reliable, the opinion's probative value is "substantially outweighed" by the

---

that every item of expert testimony has "a reliable basis in the knowledge and experience of the relevant discipline." (alterations and quotations omitted)).

Of course, the procedural handling of an objection to proposed expert testimony is a matter committed to the trial court's discretion, and a formal Daubert hearing will not in all cases be necessary. In some cases, an evidentiary hearing is unnecessary because the parties' reciprocal submissions are sufficient to enable the court to resolve the reliability issue without taking live testimony. See Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176 (stating that trial courts must retain the discretionary authority "both to avoid unnecessary 'reliability' proceedings . . . and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises").

[5] See, e.g., Kumho Tire, 526 U.S. at 153; 119 S. Ct. at 1176 (referring to the indicia of evidentiary reliability suggested in Daubert as "the specific factors identified in Daubert" and "Daubert's specific factors").

[6] See Daubert, 509 U.S. at 592-93 & n.10, 113 S. Ct. at 2796 & n.10 (stating that the reliability issue is to be decided by the trial court under Rule 104(a), and that an opinion's reliability must be proven by a preponderance of the evidence).

considerations outlined in Federal Rule of Evidence 403.[7]  If the proponent fails to

establish circumstantial facts sufficient to yield the inference that the opinion is

reliable, or the court, after weighing the facts the proponent has established, finds

that the opinion is unreliable, the opinion is inadmissible as a matter of law.[8]  Just

as a coerced confession is inadmissible because it lacks probative value as to the

issue of whether the defendant committed the criminal act to which he has

"confessed," an unreliable opinion is inadmissible because it lacks probative value

as to the factual issue it addresses.

B.

Identifying the circumstantial facts, or factors, that are to serve as the indicia

of reliability in a given case is a matter committed to the trial court's sound

---

[7]Rule 403 provides,
Although relevant, evidence may be excluded if its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue delay, waste of time, or
needless presentation of cumulative evidence.
Fed. R. Evid. 403.  We review a trial court's exclusion of a relevant and reliable opinion
pursuant to this rule under the abuse-of-discretion standard.  See Old Chief v. United States, 519
U.S. 172, 174 n.1, 117 S. Ct. 644, 647 n.1, 136 L. Ed. 2d 574 (1997).

[8]  In determining whether a circumstantial fact, or factor, exists, the court conducts in a
very real sense a miniature bench trial.  The only difference between this bench trial and a bench
trial held under the Federal Rules of Procedure is that the Federal Rules of Evidence generally do
not apply.  See Fed. R. Evid. 104(a) ("Preliminary questions concerning . . . the admissibility of
evidence shall be determined by the court . . . .  In making its determination it is not bound by the
rules of evidence except those with respect to privileges.").

discretion.[9]  In <u>Daubert</u>, the Supreme Court suggested that a trial court assessing the reliability of proposed scientific testimony might consider, among others, the following factors: (1) whether the theory or technique underpinning the expert's opinion "can be (or has been) tested"; (2) whether the theory or technique "has been subjected to peer review and publication"; (3) whether, with respect to particular theory or technique, there is a high "known or potential rate of error," and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within the "relevant scientific community."  <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 593-95, 113 S. Ct. 2786, 2796-97, 125 L. Ed. 2d 469 (1993).  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S.137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), clarified that these factors may be considered in determining the reliability of nonscientific expert opinion testimony as well.  <u>General Electric Company v. Joiner</u>, 522 U.S. 136, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997), offered an additional indicium of reliability: the analytical distance between the particular opinion offered and the data, principles, and methods from which it is purportedly

---

[9]  <u>See</u> <u>Kuhmo Tire</u>, 526 U.S. at 153, 119 S. Ct. at 1176 ([W]hether <u>Daubert</u>'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial court broad latitude to determine.").  Put another way, it is the trial court's task to decide which factors are relevant to the opinion's reliability.

derived.[10]  The factors relied upon to test reliability, however, must be "tied to the facts of the particular case," <u>Kumho Tire</u>, 526 U.S. at 150, 119 S. Ct. at 1175 (quotations omitted), and the trial court has "broad latitude" to determine which are appropriate indicia of reliability.  <u>Id.</u> at 153, 119 S. Ct. at 1176.

## C.

Understanding the model for determining the reliability of an expert's opinion sheds considerable light on the operation of the standard a court of appeals employs in reviewing the trial court's ruling on the opinion's admissibility.  We review a trial court's decision admitting or excluding evidence for "abuse of discretion,"  <u>Old Chief v. United States</u>, 519 U.S. 172, 174 n.1, 117 S. Ct. 644, 647 n.1, 136 L. Ed. 2d 574 (1997); <u>United States v. Abel</u>, 469 U.S. 45, 54-55, 105 S.

---

[10]  <u>Joiner</u> clarified that, though the focus of the reliability inquiry "must be solely on principles and methodology, [and] not on the conclusions they generate," <u>Daubert</u>, 509 U.S. at 595, 113 S. Ct. at 2797, "conclusions and methodology are not entirely distinct." <u>Joiner</u>, 522 U.S. at 146, 118 S. Ct. at 519.  Thus, even when an expert is using reliable principles and methods, and is extrapolating from reliable existing data, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Id.</u>  "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the <u>ipse</u> <u>dixit</u> of the expert." <u>Id.</u>  This consideration has been incorporated into the text of the amended Rule 702, which requires not only that "the testimony [be] the product of reliable principles and methods"—the focus of the specific considerations offered in <u>Daubert</u>—but also that "the testimony [be] based upon sufficient facts or data," and that the witness be shown to have "applied the [reliable] principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

Ct. 465, 470-71, 83 L. Ed. 2d 450 (1984), and this is true when we review rulings admitting or excluding the testimony of expert witnesses under Rule 702.[11] See Joiner, 522 U.S. at 146, 118 S. Ct. at 519; Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176. A trial court abuses its discretion in making an evidentiary ruling "if it misapplies the law or makes findings of fact that are clearly erroneous." E.g., Kelley v. Sec'y for the Dep't of Corr., 377 F.3d 1317, 1333 (11th Cir. 2004).[12]

What would a reviewing court say if the trial court, in determining whether an expert's opinion was reliable, based its finding on irrelevant factors?[13] The

---

[11] Rule 702 provides,
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
Fed. R. Evid. 702.

[12] We apply the same standard in reviewing the admission or exclusion of expert opinion testimony. See, e.g., Oddi v. Ford Motor Co., 234 F.3d 136, 146 (3rd Cir. 2000) ("We afford a district court's application and interpretation of Rule 702 plenary review, but we review the court's decision to admit or reject testimony under an abuse of discretion standard. An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." (quotations and citations omitted)); Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (stating, in reviewing a Daubert ruling, that "[a] district court abuses its discretion if its conclusion is guided by erroneous legal principles, or rests upon a clearly erroneous factual finding" (citations omitted)).

[13] If, for example, a court were to exclude an expert's opinion on the ground that the expert has red hair, it would be a clear abuse of discretion. The reason, of course, is that the expert's hair color has no logical relevance to, and therefore lacks probative value on, the

67

answer is obvious.  The reviewing court would say that the trial court misapplied

the law and therefore abused its discretion.[14]  What would the reviewing court say

if the trial court based its reliability finding on crucial circumstantial fact findings

that were clearly erroneous?  Again, the answer is obvious.  The reviewing court

would say that the trial court's reliability finding amounted to an abuse of

discretion because it was based on clearly erroneous findings of crucial

circumstantial facts.[15]

## II.

---

reliability of his opinion.

[14]  The same would be true if the district court ignored factors that were plainly crucial to the reliability determination.  I cannot imagine upholding a determination of the reliability of expert scientific testimony when the trial court ignored every consideration specified by the Supreme Court in Daubert.  Indeed, in ruling on the admissibility of scientific testimony, the trial court might abuse its discretion if it failed to consider any of the considerations outlined in Daubert.  See Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176 ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.  That is to say, a trial court should consider the specific factors outlined in Daubert where they are reasonable measures of the reliability of expert testimony."); id. at 159, 119 S. Ct. at 1179 (Scalia, J., dissenting) ("Though, as the Court makes clear today, the Daubert factors are not holy writ, in a particular case the failure to apply one or another of them may be unreasonable, and hence an abuse of discretion.").

[15]  The foregoing responses to the question, "What would the reviewing court say?" assume that the trial court's decision to admit or to exclude the expert's opinion could have "affected" the complaining party's "substantial rights"  See Fed. R. Evid. 103(a).  It goes without saying that the potential for undue prejudice—that is, for the denial of a party's substantial rights—should inform the trial court's decisions as to the timing and scope of the Daubert hearing and the need for explicit findings of fact.

With this model for determining the reliability of expert opinion testimony in mind, I turn to the question of whether the district court abused its discretion in barring Frazier's expert, Robert Tressel, from testifying to the two opinions at issue in this appeal.

Frazier sought to use Tressel, now a private forensic investigator, for the purpose of challenging the veracity of the victim's claim that Frazier forced her into sexual intercourse and, thereby, her credibility as to whether she had been kidnaped. Tressel proposed to summarize the findings of the FBI's forensic investigation of the car and the victims clothes, as well as the records of a medical examination of the victim, and to offer three opinions: (1) that "a thorough forensic investigation and a thorough rape examination of the victim . . . were performed"; (2) that "there is no forensic evidence to substantiate the claim of rape in this case"; and (3) that "it would be expected that some transfer of either hairs or seminal fluid would [have] occur[red]" if the victim's account were true.[16] Thus, Tressel sought to move analytically from the thoroughness of the investigation, the absence of

[16] I quote from the report Tressel prepared for Frazier's attorney (the "report" or the "expert report"), Defendant's Exibit 2, because it was on this report that the district court based its rulings. In his report, Tressel also stated: "The resulting laboratory findings in this case[] do not substantiate the claim of rape through forensic evidence." At the Daubert hearing, Tressel said: "I see no forensic evidence to substantiate the claim of rape in this case." He also said: "[T]here should have been some transfer of either hairs, fibers or fluids between the victims [sic] in this case."

forensic evidence, and his opinion that such evidence would be "expected" if the victim's claims were true, to the implication that some hair or seminal fluid should have been, but was not, recovered, and that the rape therefore never occurred.[17] This, in turn, was meant to impugn the credibility of the victim, whose testimony provided the primary foundation for the kidnaping charge.

The district court allowed Tressel to offer all of his proposed testimony except two of his ultimate opinions: that there was no forensic evidence to substantiate the claim of rape, and that the transfer of some hairs or fluids would have been "expected" if the victim's claim were true. It is the exclusion of these opinions that Frazier now questions.

The district court did not abuse its discretion in excluding these opinions. The court correctly identified as crucial to the reliability of both opinions circumstantial facts that Tressel either did not attempt or was not qualified to establish, and Frazier offered no supplementary proof to establish these facts. Thus, Frazier failed to prove by a preponderance of the evidence that these two

---

[17] In fact, at the <u>Daubert</u> hearing, Tressel's ultimate opinion was elicited with the question, not whether the claim of rape was supported by forensic evidence, but whether, in Tressel's opinion, the rape <u>occurred</u>. Defense counsel asked, "[B]ased on the information I provided to you, do you have an opinion about whether or nor a rape occurred in this case?" Tressel responded, "I do. I see no forensic evidence to substantiate the claim of rape in this case."

opinions were reliable, and the court implicitly found them unreliable. Because the court's findings that Tressel's opinions were unreliable were not clearly erroneous, the exclusion of these opinions was not an abuse of discretion.

## A.

I first address the district court's ruling excluding Tessel's opinion that he saw "no forensic evidence to substantiate the claim of rape in this case." The obstacle Frazier had to overcome to establish the reliability of this opinion was Tressel's inability to negate the inculpatory power of one item of "forensic evidence" that squarely corroborated the victim's story: bruising to and discoloration of the victim's genital area discovered during a medical examination conducted shortly after she and Frazier were pulled from her wrecked automobile. To overcome this obstacle, Tressel attempted to provide an explanation for this bruising and discoloration that would not inculpate Frazier.

Tressel stated in his expert report, and proposed to testify at Frazier's trial, that "[t]he documented finding of bruising around the labia major indicates that the bruising may be substantially older than only a few hours," and that "[t]he only indication that any type of sexual activity occurred, . . . the redness around the labia

71

major and the redness of the cervix . . . . can occur during routine normal sexual activity." Tressel implied that the bruising and discoloration was caused by sexual intercourse between the victim and her boyfriend, which, according to the victim's medical records, had occurred two days before the alleged kidnaping.[18]

On cross-examination, however, Tressel acknowledged that he was not a physician and had no experience in the medical field. He had no training in pelvic examinations of sexual assault victims, nor had he examined the victim in this case. The district court reasonably (indeed, necessarily) recognized that the reliability of Tressel's "no forensic evidence" opinion was, as Tressel had presented it in his report, dependent on the establishment of the fact that someone other than Frazier

---

[18] For his opinion that there was that there was no forensic evidence to substantiate the claim of rape, Tressel relied upon the following circumstantial facts:

> All findings of the samples that were taken, all of which are essentially routine rape investigation procedures, were negative in finding a transfer of seminal fluid or hair from the defendant in this case. The medical examination of the victim only shows evidence of sexual activity on the part of the victim at some time prior to the examination taking place. The documented finding of bruising around the labia major indicates that the bruising may be substantially older than only a few hours.

> Based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case. The only indication that any type of sexual activity occurred is the redness around the labia major and the redness of the cervix. These two injuries, in and of themselves, can occur during routine normal sexual activity. [The alleged victim's] medical records indicate that she had sexual intercourse on 10/29/00.

Def. Ex. 2, at 2-3.

caused the genital bruising and discoloration. The court ruled that Tressel could not testify as to the cause of the bruising and discoloration because he was not qualified to do so; a physician would have to provide that testimony.[19] Frazier proffered no such testimony.[20] Because Frazier failed to present competent evidence of a circumstantial fact the court deemed essential to the admissibility of Tressel's opinion, the court excluded the opinion. Although the court did not make an explicit finding that Tressel's opinion was unreliable, it made an implicit finding to that effect. Because that implicit finding is not clearly erroneous, it cannot be said that excluding the opinion constituted an abuse of discretion.[21]

---

[19] The court said, "I am not going to allow him to testify about the bruising. I would a medical doctor but not a witness with these credentials, and particularly one who did not conduct the examination." This ruling was later reiterated:

> [T]he primary evidence is going to produce negative reports in every area but one, and that's the question of the bruising. . . .
> I am not going to allow him to testify in his opinion those bruises were old or something. I just think that is not a field of his expertise. You have to have a medical opinion given on that . . . .

[20] If Frazier had proffered a physician's (or other qualified expert's) opinion that the victim's sexual intercourse two days earlier probably caused the bruising and discoloration, defense counsel could have asked Tressel to assume the validity of the opinion and then asked him whether, in light of that opinion and his experience as a forensic investigator, he had an opinion regarding the presence or absence of forensic evidence of rape. Had this taken place, I suggest that the court would have permitted Tressel to give the opinion at issue.

[21] The court treats Tressel's opinion that there was "no forensic evidence to substantiate the claim of rape" as Tressel's ultimate opinion—that is, as one built on his other opinions, including that hair or fluid transfers "would be expected" if the victim's claims were true. See ante at 48 n.18. The court concludes that the district court properly excluded Tressel's "no

B.

Frazier also challenges the district court's exclusion of Tressel's opinion that, given the circumstances of the alleged rape, some transfer of hairs or seminal fluid between Frazier and the victim would have been expected.[22]

To support his opinion, Tressel purportedly relied on his extensive experience in forensic investigations, including investigations of sexual assaults, and several abstract factual propositions about the types of evidence found in sexual assault investigations and the factors affecting the likelihood of transfer and recovery. These abstract factual propositions are actually inferences that Tressel drew from a combination of (vaguely identified) law enforcement texts and his professional experience and training.[23] I number them for convenience:

forensic evidence" opinion because it relied upon Tressel's "expectancy" opinion, which the district court properly excluded as unreliable. But Tressel's statement that there was "no forensic evidence to substantiate the claim of rape" is not, on its own terms, dependent on any foundational opinions about what forensic evidence one would have expected to find at the crime scene. Tressel did not offer the opinion that the victim had lied, that no rape had occurred, or even that the lack of forensic evidence contradicted the victim's story. He testified only that there was no forensic evidence to substantiate the victim's claim, and this statement was dependent only on his finding that no fibers, hairs, or seminal fluids were recovered and his ability to explain away the victim's bruising.

[22] The record is silent as to whether any hairs or seminal fluid was found on Frazier's clothing or body following his arrest. Apparently, only the victim, her clothing, and her car were examined for such evidence.

[23] The law enforcement texts and the information Tressel gleaned from investigating sexual assaults provided him with the circumstantial evidence from which he inferred the abstract factual propositions. These propositions, in turn, served as the circumstantial facts for

74

(1) "The forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim."

(2) "These hairs are routinely pubic hairs that become transferred [sic] during sexual intercourse."

(3) "Head hairs can also be transferred during sexual assault and can be found in the clothing of the victim and the perpetrator."

(4) "Seminal fluids are frequently found in sexual assault cases, especially when multiple episodes of sexual activity occur and no condom is used by the perpetrator. These fluids can be found not only in the orifices of the victim, but also on the clothing worn by both the victim and the perpetrator."

(5) "The smaller crime scene, the more likelihood [sic] that you are going to find evidence to support a claim."

(6) "The number of sexual encounters that occur between a suspect and victim raises the likelihood of some transfer of forensic evidence."

Tressel apparently combined these circumstantial facts with the "very confined area" in which the rape allegedly occurred, the quantity and duration of the sexual acts it involved, and the lack of any mention of a condom being used to conclude that hair or seminal fluid transfers "would be expected" or "should" have occurred.

What troubled the court about Tressel's "expectancy" opinion was that Tressel was unable to indicate the frequency with which hairs and seminal fluid transfers occur in sexual assault cases and, in particular, cases like the one at hand. Tressel could not testify to such frequency from his own experience, and he was

_____

the ultimate inference Tressel drew—that is, that one would have "expected" that hair or seminal fluid transfers would have been recovered during the investigation of the rape that allegedly occurred in this case.

75

unable to cite any published findings on the subject. Without some indication of the frequency with which hairs and seminal fluid are transferred during sexual assaults, the court concluded, it could not find reliable Tressel's opinion that hair or seminal fluid transfers "would be expected" or "should" have occurred in this case. In my view, the court acted well within its discretion in placing great weight on this frequency factor. Thus, when Frazier failed to provide that missing link, the court was fully justified in striking Tressel's opinion as unreliable.

The court's focus on the transfer rates for hair and seminal fluid was entirely reasonable because Tressel's "expectancy" opinion was not permissibly inferable from the circumstantial facts upon which he purportedly based it, and the most obvious gap in Tressel's reasoning was his inability or unwillingness to say how often hairs and seminal fluid are transferred between victim and perpetrator during sexual assaults. Tressel's "expectancy" opinion expresses an estimate of absolute probability. At minimum, it implies that, given the events alleged by the victim, it is more likely than not—that is, there is more than a fifty-percent chance—that a transfer would have occurred.[24] Most of the propositions upon which Tressel

---

[24] I do not agree with the court that the ambiguity of the phrase "would be expected" in any way affects the <u>reliability</u> of Tressel's opinion. Lack of precision in expert testimony might properly form the basis for its exclusion, but such a ruling would be made under Rule 403, not under the reliability requirement of Rule 702. There is no requirement that experts use precise, as opposed to general, statements of probability. Indeed, Tressel would have only guaranteed the

relied, however, are statements of relative probability—that is, that a substance is more or less likely to be found under particular circumstances than others, or that one substance is more or less likely to be found than another. Without knowing the baseline at which we start—the average rates of transfer for hair and seminal fluids, generally or under particular circumstances—these propositions cannot support a statement of absolute probability like the one Tressel made. It helps none, for example, to know that the forensic evidence "most commonly" found is the transfer of hairs, or that hairs and seminal fluid are "more likely" to be found if the crime scene is small or if multiple incidences of sexual contact occur; since we do not know the baseline probabilities, we cannot say whether "most commonly" or "more

exclusion of his testimony on reliability grounds had he opined that there was a specific percentage chance that hairs or seminal fluid would have been transferred in this case, since it is patently impossible to state such an estimate with any confidence. That Tressel phrased his probability estimate in general terms made it much more likely that the estimate could have a basis in his experience as a forensic investigator.

Similarly, I do not agree that Tressel's opinion could have properly been excluded under Rule 702 on the ground that it does not "assist the trier of fact to understand the evidence or to determine a fact in issue" because "Tressel's imprecise opinion easily could serve to confuse the jury, and might well have misled it." Ante at 49. As the Supreme Court made clear in Daubert, the requirement that expert testimony "assist the trier of fact" "goes primarily to relevance," 509 U.S. at 591, 113 S. Ct. at 2795; it is not a requirement that expert testimony be given in specific and certain terms. Again, if the ambiguity of expert testimony, and its concomitant potential to confuse the jury, is to form the basis for its exclusion, this ruling would properly be made under Rule 403, not Rule 702.

On the other hand, neither do I agree with Judge Birch's characterization of Tressel's opinion as "qualitative." In expressing his opinion that hairs or seminal fluid "should have been" transferred or that some transfer "would be expected," Tressel was making an inherently probabilistic statement. At minimum, it suggested that it was "more likely than not" (i.e., something more than a fifty percent chance) that such transfers would have taken place. Such a statement is general, and non-numerical, but it is certainly not "qualitative."

likely" could be enough to move the probability of finding hairs or seminal fluids in a particular case over the fifty-percent boundary. In other words, without some indication of transfer rates, the court was unable to gauge whether it is possible for Tressel or any other expert to conclude that under a particular set of specific circumstances, one would "expect" to find hair or seminal fluid transfers.

Some of the factual propositions upon which Tressel relied—for example, that seminal fluid is "frequently" found, or that head hairs "can" be found on the perpetrator's clothing—are statements of absolute probability, but they do not logically get us near the fifty percent mark. "Can" necessarily connotes only a bare possibility (something over one percent), and though "frequently" suggests something more, it does not connote "usually" or "most of the time" or in any way suggest that something happens "more often than not."

Logically, then, the factual propositions Tressel relied upon, even if inferrable,[25] could not support his statement that hair or seminal fluid transfers

_____

[25] See supra note 23. I emphasize "if." I have grave doubts about whether Tressel established the reliability of even the circumstantial facts upon which his opinion was purportedly based. On cross-examination, Tressel vaguely identified three texts, none of which were produced for the court: "Practical Aspects of Rape Investigation by Robert Hazelwood," "a forensic science handbook by Dr. Saperstein," and "Crime Scene Search and Physical Evidence Handbook by Carl Cunningham, United States Government Printing Office, 1973." Contrary to Judge Birch's suggestion, however, see post at 5 n.3, Tressel did not "rely upon" these texts: he neither quoted from nor cited specific portions of them, nor did he provide excerpts for the district court to examine. The court consequently had no basis on which to conclude that they supported his testimony. Nor do these sources, to the extent they are identifiable, support

should have occurred, much less the implication the jury was to draw from this evidence, that hairs or seminal fluid should have been <u>recovered</u>.[26] Instead, the circumstantial fact upon which the reliability of Tressel's opinion turns is the rate at which hairs or seminal fluid are transferred from the perpetrator and the victim. Without some evidence in this regard—whether from scientific studies or from

Tressel's testimony. The one text he clearly identified, <u>Practical Aspects of Rape Investigation</u>, does say that "hairs, fibers, blood, semen, and saliva <u>appear with frequency</u> in sexual assault cases," and that "[t]he type of evidence <u>most frequently associated with</u> sexual assault investigations is semen." <u>See</u> <u>Practical Aspects of Rape Investigation</u> 111 (Robert R. Hazelwood & Ann Wolbert Burgess ed., 1987) (emphasis added). But Tressel said neither of these things. Instead, he said that hairs transferred between victim and perpetrator are the forensic evidence "<u>most commonly</u> found," that such hairs are "<u>routinely</u>" public hairs, and that seminal fluids are "<u>frequently</u> found" (emphasis added). Even assuming that "found with frequen<u>cy</u>" is synonymous with "frequen<u>tly</u> found," the quoted portions of text do not support the notion that the evidence "most commonly found" is hairs transferred between victim and perpetrator.

In any event, the court did not preclude Tressel from making these foundational statements, but instead precluded him from testifying that either hairs or seminal fluid "would be expected" in this particular case, an opinion that is an analytical chasm away from hairs and seminal fluid being "frequently found" in sexual assault cases generally. Among other patent logical gaps, Tressel never explained how his ultimate opinion was affected by the victim's claim that Frazier never ejaculated, nor did he account for the fact that the search for forensic evidence included the victim, her clothing, and the car, but not, apparently, Frazier or his clothing. Even if the circumstantial facts upon which Tressel relied are entirely true, and Tressel had shown them to be so, they would not establish the reliability of his opinion that some hairs or seminal fluid "would be expected" in this case.

[26] Though Frazier did not object to the reliability of the testimony offered by the Government's experts, Karen Lanning and Anthony Onorato, it bears noting the substantial gap between their testimony and Tressel's proffered opinion. Lanning and Onorato offered (1) estimates of how often, in their experience, hair or seminal fluid evidence is recovered in sexual assault investigations, and (2) their opinion that the absence of such evidence does not necessarily mean that no assault occurred. Neither purported to say that, given these preliminary propositions and the facts of this particular case, one would <u>not</u> <u>have</u> "expected" to find hair or seminal fluid.

Tressel's personal experience, whether in the form of specific figures or general probabilities, and whether in sexual assault cases generally or in cases similar to this one—the court had no basis on which to find that Tressel's opinion was reliable.

Yet Frazier produced <u>no</u> evidence on this point. On cross-examination at the <u>Daubert</u> hearing, the Government repeatedly invited Tressel to explain how his experience informed his "expectancy" opinion. Tressel pointed only to one case he had investigated in which the head hair and pubic hair of a serial rapist was found on four of the rapist's victims, drawing no comparison between the facts of that case and those of this one. He offered no general observations about the frequency with which, in his experience, either hair or seminal fluid is transferred or recovered, much less the frequency of transfers in cases involving multiple episodes of unprotected sexual contact, and he stated that he was unaware of any studies that could provide this information. Because Frazier failed to produce <u>any</u> evidence on the circumstantial fact the court reasonably found crucial to the reliability of Tressel's "expectancy" opinion, the court correctly excluded the opinion.[27]

---

[27] It is true that the Government did not ask Tressel if he could state the frequency with which, in his own experience, seminal fluid or hair is found, and that the Government focused primarily on whether there was any "scientific literature" to support Tressel's probability

Frazier argues that the district court required that the opinion be based on published, scientific studies or scientific expertise that Tressel did not possess, and he sees this as evidence of a mistake of law—that is, that the court incorrectly assumed that Rule 702 requires that an opinion like Tressel's have scientific foundations. The district court did not, however, find Tressel's opinion unreliable because it had no grounding in scientific studies; it found the opinion unreliable because Frazier, who had the burden of proof, offered <u>no</u> evidence—experience-based or otherwise—on the factual issue the court correctly identified as central to the reliability of the opinion. To ask whether there are studies validating part of the testimony of a skill- or experience-based expert is not improperly to require that the testimony rest on scientific foundations or that the expert have scientific expertise. See <u>Kumho Tire</u>, 526 U.S. at 157, 119 S. Ct. at 1178 ("Nor, despite the prevalence of tire testing, does anyone refer to any articles or papers that validate Carlson's approach."). When the expert's experiences have not alone been shown to be capable of providing a sufficient foundation for a particular opinion, corroboration from somewhere—whether in the opinions of other experience-based witnesses or

statement. But the Government did not have the burden of proving that Tressel's opinion <u>was not</u> grounded in his experience. Rather, Frazier, as the proponent of the opinion, bore the burden of establishing that the opinion was reliable. If Tressel was prepared to offer a probability statement from his own experience, whether specific (<u>e.g.</u>, that he finds hairs in 75% or even 51% of his investigations) or general (<u>e.g.</u>, that hairs are "usually" found), it was Frazier's obligation to put that forward.

in published, scientific studies—is necessary to establish the opinion's reliability. The district court made an implicit finding that Tressel had not sufficiently established how his experience led him to the opinion he offered. It then went on to require that, in the absence of such evidence, Frazier show that the opinion had some support in scientific literature. Requiring that the proponent of an expert opinion provide <u>some</u> basis for a determination that the opinion is reliable is never an abuse of discretion.

III.

In summary, the model for reviewing a trial court's finding as to the reliability of an expert opinion requires that we uphold the finding unless the court abused its discretion in reaching it—that is, unless the court misapplied the law or based its finding on a clearly erroneous finding as to one or more circumstantial facts crucial to a finding of reliability. Keeping these points in mind, I think it clear that the district court did not abuse its discretion in arriving at its findings that Tressel's opinions—that "there is no forensic evidence to substantiate the claim of rape in this case" and that if the victim's claim of rape were true, "it would be expected that some transfer of either hairs or seminal fluid would [have]

82

occur[red]"—were unreliable. Frazier simply failed to establish by a preponderance of the evidence the circumstantial facts that the court, in the exercise of its discretion, identified as crucial and highly relevant indicia of reliability. Because the district court did not abuse its discretion in the manner in which it resolved the reliability issues, and because the court's findings as to the opinions' reliability were not clearly erroneous, the court was bound to exclude them. Indeed, the court would have abused its discretion had it permitted the jury to hear them.

BARKETT, Circuit Judge, concurring:

I concur in the majority opinion and find exceedingly useful its parsing of the methodology for admitting expert testimony that is based on experience. As the dissent accurately notes, the requirements of qualification and reliability are "often blurred in the case of experience-based expert testimony." Birch Dissent at *111. That is precisely what the majority now clarifies and will not permit. The reliability prong is not to be "subsumed" by the qualification prong – "the reliability criterion remains a discrete, independent, and important requirement for admissibility." Majority Op. at *33.

While experience may be sufficient to qualify a person as an expert, the ipse dixit of an expert in a given field is simply not enough to establish the reliability of a particular opinion. Id. The majority makes clear that where a witness relies

> solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'

Id. (quoting Fed. R. Evid. 702 advisory committee's note (2000 amends.)).[1]

---

[1]As the dissent notes, past cases have not always explicitly required more than mere experience in order to establish the reliability of a specific opinion in cases involving physicians, valuation experts, handwriting analysts, police officers, and so forth. Yet, as the majority makes clear, courts must always take care to establish (1) how the expert's specific experience leads to

I agree that the district court properly excluded Tressel's testimony because he failed to establish how his experience led to the specific conclusion that "it would be expected that some transfer of either hairs or seminal fluid would occur." R5 at 24, Ex. 2 at 2. Indeed, the only support Tressel offered to validate his claim was that in one rape case he worked on he "identified head hair and pubic hair" of a serial rapist on four victims. R5 at 37-38.[2] Had the government's expert witnesses similarly failed to establish how their experience led to their conclusions, the court would have been compelled to exclude their testimony as well.[3] However, as the majority points out, the government witnesses provided specific and detailed quantitative bases for their opinions. Thus, the district court acted within its discretion.

the conclusion reached; (2) why the expert's experience is a sufficient basis for the opinion; and (3) how the expert's experience is reliably applied to the facts. Majority Op. at *33.

[2] Tressel also asserted that this conclusion was derived from his knowledge of scientific literature but admitted that he "doesn't think anybody has ever studied the rates of transfer." R5 at 37.

[3] Obviously, a trial court would abuse its discretion in admitting the testimony of only one side's expert, where the experts on both sides proffer testimony that is equally reliable. United States v. Gaskell, 985 F.2d 1056, 1063 (11th Cir. 1993) (per curiam) ("It is an abuse of discretion to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.") (internal punctuation omitted).

BIRCH, Circuit Judge, dissenting:

For the reasons that follow, I respectfully dissent. This is the classic case that law students study to understand the adage "hard facts make bad law." Those hard facts (the majority calls it a "sad case" and a "crime of unspeakable brutality") have caused the trial court and a majority of this court to elevate an evidentiary rule, improperly administered, over a criminal defendant's basic right to "present his own witnesses to establish a defense. This right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967); Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). As demonstrated below, the exclusion of the defense's expert "gutted" its only viable defense. See, infra, notes 6 & 10. And, while the trial court is indeed vested with broad discretion in ruling upon the relevancy and admissibility of evidence, we have appropriately, until this case, held that "[s]uch discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense." United States v. Kelly, 888 F.2d 732, 743 (11th Cir. 1989).

What is particularly disturbing is that the trial court allowed the government, over objection, to use two FBI laboratory technicians who were called as fact

86

witnesses in the government's case-in-chief, on rebuttal to testify as to the import of a lack of forensic evidence found at the crime scene without requiring any support for their testimony of a statistical or scientific nature. The presence of lack of such forensic evidence and its import was precisely the testimony the defense expert witness was prohibited from providing. See, infra, notes 7 & 22. What was good for the government gander essentially cooked the defense's goose in this case.

## I. BACKGROUND

The trial court's ruling in this case was an abuse of discretion for two principal reasons: (a) the district court committed a Daubert[1] error, which involved two parts: (1) requiring scientific evidence for the defense's experience-based expert to be reliable while (2) not similarly requiring the Government's experience-based experts to have a scientific basis for their testimony; and (b) the district court's Daubert error essentially deprived Frazier of the opportunity to present a meaningful defense. I address each error in turn.

A. Erroneous *Daubert* Rulings

Before trial, Frazier gave notice to the Government that he intended to offer the testimony of Robert Tressel, a forensic investigator and former police officer,

---

[1]Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

as an expert under Federal Rule of Evidence 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993). Accordingly, the Government made a motion in limine to exclude Tressel's testimony under Daubert, and the district court accordingly held a hearing on the motion. During the Daubert hearing, it became clear that Tressel's expertise was based on his experience,[2] which also was

_____

[2]Defense counsel explained that "we are not offering Mr. Tressel for his scientific expertise. Rather, we believe that he's qualified . . . based on his experience . . . in crime scene investigations." R5 at 42. Defense counsel stressed that "someone like Mr. Tressel" was necessary "to tie all this evidence together" for the jury. Id. Defense counsel reiterated Tressel's qualifications: "*Again, we are not offering him as a scientific expert but strictly based upon his experience.*" Id. at 43 (emphasis mine).

During the Daubert hearing, Tressel expressed his opinion that the investigation of the crime scene was "thorough" and that proper "protocol for [a] rape examination was followed." Id. at 22 ("the proffer"). Defense counsel then asked Tressel whether, based on all the information he reviewed about the crime, he had an "opinion as to whether or not the description of the sexual assault provided by [the victim] . . . [was] accurate?" Id. at 23-24. Tressel responded that, "based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case." Id. at 24. Asked if he had "an opinion about whether or not a rape occurred," id. at 25, Tressel responded that he "s[aw] no forensic evidence to substantiate the claim of rape in this case," id. Based on where the sexual assault allegedly occurred [the passenger compartment of a small car], the amount of sexual contact involved, and the evidence examined by Tressel, he stated that he formed his conclusion because "[t]here should have been *some* transfer of either hairs, fibers or fluids between the victims in this case." Id. at 27 (emphasis mine).

Recall that the FBI laboratory found absolutely *no* transfer of hair (pubic, body, or head) or fluid, despite a closed and confined collection site and meticulous collection protocol. See R9 at 343-44, 352, 356-58.

88

informed by scientific studies[3]:  for ten years,

_____

[3]When asked by the Government during the <u>Daubert</u> hearing whether his experience was informed by any academic literature, Tressel responded in the affirmative:

        Government:  What did you rely on, sir?

        Tressel:  Practical Aspects of Rape Investigation, a Multi-Disciplinary Approach.

        Q:  And that's by whom?

        A:  Robert Hazelwood and Ann Burgess.

        Q:  And generally what does the book say about this particular opinion you have here?

        A:  That the most common thing that you find is transfer of hair and fiber evidence from victim to victim – victim to perpetrator, perpetrator to victim.

        Q:  The most common thing you find?

        A:  In a rape case. . . .

        Q:  What scientific literature are you familiar with concerning the transfer of hair during a sexual assault?

        A:  I just told you Practical Aspects of Rape Investigation.  There's also a Forensic Science Handbook by Dr. Saperstein.

        Q:  And what does it say?

        A:  It just deals with hair transfer.  They don't discuss pubic, head, body, limb hair.  They just talk about hair transfers.

        Q:  Any other scientific literature that you are familiar with or you're relying on?

        A:  No, sir.  There is an – one of the first things I ever received as a law enforcement officer, and I'd have to really look this up because I can't remember it exactly.

        It's a crime scene search and physical evidence handbook by Carl Cunningham, United States Government Printing Office, 1973.

        Q:  What does it say in regard to this area?

        A:  Essentially the same thing. . . .

        Q:  I want to ask you specifically what does it say about the rates of transfer of hairs?

        A:  I don't think anybody has ever studied the rates of transfer that I can say.  They all indicate that transfer of hair is the most common trace evidence that can be found in a sexual assault case.

        Q:  So when you issued your opinion, you weren't familiar with any scientific literature in regard to the rate of transfer of hairs in sexual assault cases; isn't that correct?

        A:  I am not, no, sir. . . .

        Q:  Now in regard to your opinion that you placed in your report that seminal fluids are frequently found in sexual assault cases . . . what particular scientific literature did you base that on?

Tressel worked as an investigator in Cobb County's unit on Crimes Against Persons, a unit which investigates homicides, rapes, other sexual assaults, and armed robberies. R5 at 5-6. Tressel estimated that he worked on as many as 250 sexual assault cases during his tenure. Id. at 9. In addition, Tressel spent thirteen years as chief investigator in the Cobb County Medical Examiner's Office, id. at 10, and currently owns and operates a private forensic investigation office. Def. Ex. 1. Based on Tressel's background, the district court deemed him "a very qualified criminal investigator." R5 at 66.

### 1. Requiring Scientific Evidence

Despite Tressel's qualifications as an expert, the district court decided to tightly circumscribe the limits of Tressel's proposed testimony on the ground that Tressel, as an experience-based expert, needed some scientific data or study on

---

A: Again, it was the Practical Aspects of Rape Investigation and from my experience in investigating rape cases.
R5 at 35-38.

The academic literature relied upon by Tressel support his contention that the following types of evidence "appear with frequency in sexual assault cases": "hairs, fibers, blood, semen, and saliva." ROBERT R. HAZELWOOD & ANN WOLBERT BURGESS, PRACTICAL ASPECTS OF RAPE INVESTIGATION: A MULTIDISCIPLINARY APPROACH 97 (1987). In fact, "[t]he type of physical evidence probably most frequently associated with sexual assault investigations is semen." Id. at 111. Moreover, "especially if there was physical force, hair is frequently found as evidence." JAMES E. DOYLE, WISCONSIN DEP'T OF JUSTICE, PHYSICAL EVIDENCE HANDBOOK 138 (5th ed. 1993).

which to base his conclusions in order for them to be reliable[4]—even though the

[4]The majority concedes:

> Frazier argues, however, that the district court erroneously treated scientific background as a prerequisite to expert status, and we agree that, had the court done so, it would have erred as a matter of law, because Rule 702 expressly contemplates that experts may be qualified based on experience. However, *our review of the entire record* suggests that the district court excluded Tressel's testimony not because he lacked a scientific background, but because he failed to establish that his opinions were methodologically reliable or sound.

Maj. Op. at * 40 (emphasis mine).

A review of the following quoted portions of the <u>Daubert</u> hearing, however, clearly demonstrates that the trial court *did in fact* require a **scientific** basis for Tressel's testimony. Perhaps the majority can point and quote directly from the record for the reader, as opposed to the "our-review-of-the-entire-record-suggests" approach to justify its unjustifiable conclusion that the trial court required *scientific* evidence—even in the face of its own concession.

> Court: Taking Defendant's Exhibit Number 2 [Tressel's Report of Findings], and using that as the basis for my rulings, . . . I have no problems with his expertise as he is obviously a very qualified criminal investigator. . . .

> But when it comes to the conclusions that you propose to offer him for, I believe that's exactly what the line of cases beginning with <u>Daubert</u> are aimed at, and I guess as the gatekeeper, I won't open it for those paragraphs [the last two full paragraphs on page 2 and the first two paragraphs on page 3 of Tressel's report, R5 at 24, Ex. 2] that I am talking about. . . .

> Defense Counsel: Your honor, I see it as the converse to the FBI Agent or the DEA Agent, for instance, in a drug case that says typically based on my experience in a drug case, we expect to see pagers, we expect to see baggies, we expect to see code in their talk on the telephone, we expect them to see rendezvous at the fast food restaurants. All the stuff that we typically see that is based on their experience. . . .

> Court: Now, I do have a problem and particularly if there is any **scientific evidence** that shows that in 99 percent of the time you find pubic hair, I would have no problem with that, but he has no study. . . .

> I have no problem with him saying that's what they're looking for, but I do have a problem with him saying that that's what's found, and if it's not there, I don't believe there was a rape, and I'm not going to allow that.

> Defense: But he's only saying it doesn't corroborate her claim of rape, and it seems to me that those concerns that he didn't do a scientific study are issues for cross-examination.

> And the government is distressed or objecting because he is too specific rather than talking in broad terms. Where I would have thought that the reason that he is narrowing it to his opinion to that the physical evidence does not

Government admitted during the <u>Daubert</u> hearing that such scientific evidence existed.[5]  The district court ruled that Tressel would be allowed to testify regarding

---

corroborate her story is a very specific statement without him drawing the conclusion that she wasn't raped, but he's saying that it doesn't support her story, doesn't substantiate her story.

Court:  Well, what you're trying to do is get a witness to testify to what you should be arguing. . . .

**Defense:  But how is a lay jury going to know whether or not you should be finding this stuff, some trace evidence, some fluid evidence.**

Court:  *If you have any **scientific evidence** that would indicate you should, I have no problem, as I said, with his testifying that's what they look for, but when you start trying to prove that there is no case because they didn't find it, you have got to have something more than just his opinion.  *You need something showing some study*.

I have no idea whether - - I don't have enough to tell me how often that is, and I have no basis of knowing, and based upon what you've presented today, I would not and will not allow it.  I don't think that helps the jury.

R5 at 64, 66-69 (emphasis mine).

[5]The following illustrative exchange took place during the <u>Daubert</u> hearing:

Government:  If you look at what the witness stated, he says the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim. . . .

There is no evidence that's been placed before you that leads you, Your Honor, to conclude that hair will be transferred in X percentage of cases, under X circumstances or even what the variables might be that control whether hair is transferred.

All we have is there is no transfer here, and hair is the most commonly found piece of evidence during a rape investigation.  No evidence that when he says it's most commonly found, no evidence that that means that it's found in 90 percent of the cases, 70 percent of the cases, 3 percent of the cases, and seminal fluid evidence is found in only two percent of the cases.  You don't have any basis based on the foundation placed before you in this record to conclude that this assists the jury in any way. . . .

There is no evidence that routinely in a rape investigation you will have hairs transferred or hairs found.  None.  Nothing before this court to that effect. . . .

No **scientific evidence** has been placed before you to show you at what rate you can expect to see a transfer of seminal fluid after sexual contact or after

specific types of sexual activity. . . . He is not even familiar with any scientific literature to that effect. . . .

> *Court:  Is there any **scientific literature** available?*

> *Government:  It is not my duty to present it.  I am not moving this, Your Honor.*

> *Court: I realize that, but is there any available that you are aware of?*

> *Government: Yes, there is, Your Honor.*

Id. at 44-46 (emphasis mine).  At this juncture, as an officer of the court, the prosecutor, who was well aware of the scientific literature and its inconclusive nature, as discussed below, should have advised the court of same so that the court could have made a fully informed judgment as a gatekeeper.  I find the prosecutor's failure to be forthcoming a serious ethical lapse.  *See* note 11, *infra*.

    While limited in scope, application, and probativeness, examples of the scientific literature available (*other* than the two sources relied upon by Tressel) are principally two academic articles.  One article studied the rate of pubic hair transfers "following one episode of sexual intercourse by each of 15 volunteer test couples"—a small sample size in a controlled environment.  Mary-Jacque Mann, *Hair Transfers in Sexual Assault: a Six-Year Case Study*, 35 J. FORENSIC SCI. 951, 953 (1990).  This study admitted that "[p]ublished controlled hair transfer studies are a valuable source of clarifying information, but . . . such studies are disappointingly few in number."  Id. at 951.  **This article also conceded that "controlled transfer studies and the results of casework examinations should not be given equal weight**."  Id. at 955 (emphasis mine).

    A second, more recent article measured "the frequency of pubic hair transfer between a limited number of consenting heterosexual partners"—another admittedly "limited study."  David L. Exline, M.S.F.S., et al., *Frequency of Pubic Hair Transfer During Sexual Intercourse*, 43 J. FORENSIC SCI. 505, 507 (1998).  The article made two conclusions:  "[f]irst, pubic hair transfer does occur during sexual intercourse, and is significant forensic evidence when found.  Second, further studies in the area of hair transfer frequencies are needed to better evaluate hair transfer evidence."  Id. at 507.  While **this study** explained that "[i]t is well known that pubic hairs may be transferred during certain sexual offenses," it also **admitted that "[f]ew controlled studies have been reported which could allow predictions of how frequently examiners might expect to observe such transfers."  Id.  It also conceded that "[w]ithout additional studies, it is not clear that our results with a limited number of people would be found if larger numbers of individuals were examined, even under the controlled conditions described**."  Id. (emphasis mine).  *Importantly, the article did note that "[p]rior to this study [i.e., before 1998], research concerning the transfer frequency of pubic hair was based on either forensic casework or limited human subject data" and "[u]ntil now, when asked in court about the frequency of pubic hair transference, **experts could rely only on experience because of the lack of scientific literature**."*  Id.

93

the standard procedures in investigating the site of an alleged sexual assault and to

testify that no hair or fluid matching Frazier was found. Tressel could testify, for

example, that "[t]he forensic evidence most commonly found during the analysis of

rape investigation is the transfer of hairs." R5 at 24, Ex. 2 at 2. Tressel was

forbidden, however, from testifying to two key propositions: (1) "Based on my

review of the available documents, it is my professional opinion that there is no

forensic evidence to substantiate the claim of rape in this case," and (2) "With the

amount of sexual activity described in the search warrant affidavit, it would be

expected that some transfer of either hairs or seminal fluid would occur in this

case." R5 at 24, Ex. 2 at 2, 3. Both the defense and the trial judge recognized that

excluding this key testimony left no further use for Tressel as a witness.[6] R5 at 65-

---

(emphasis mine). But this study was also of little probative value in that it examined the
rate of hair transfer of "six Caucasian couples who collected their pubic hair combings
immediately following intercourse." Id. at 505.

    The relevant academic literature cited by these studies also reveals significant
inconsistencies in reported transfer rates between these and the few other studies that
have been performed. Indeed, the rates ranged from zero to forty-five percent. See id. at
506; Mann, supra, at 953. If applied rigidly to specific cases of alleged rape, each with
their dissimilar circumstances and variables, these studies may be a significant source of
potential error. Overall, the paucity of, inconsistency between, and lack of appropriate
controls and common situational variables in these studies demonstrate that the body of
knowledge in this area is still in its infancy. By comparison, the qualitative testimony
offered by Tressel would have been relatively inoffensive, unobjectionable, and hardly
polemical, as evidenced by its wholesale endorsement by one of the field's leading
textbooks.

    [6]Defense counsel advised the court that whether a sexual assault occurred is "absolutely
critical to . . . impeaching [the victim's] credibility on the kidnapping itself," R5 at 54, and that, if

94

66.  As a result, the defense was left to elicit the lack of forensic evidence matching

Frazier from two FBI laboratory technicians—Agent Karen Lanning and Agent

Anthony Onorato—who examined the evidence discovered at the crime scene after

a meticulously careful collection process that no one disputed.  See, e.g., R5 at 24,

Ex. 2 at 2; id. at 67.

## 2.  The Error Compounded

On rebuttal, however, the district court's initial Daubert error was

compounded when the Government was allowed to use these same FBI laboratory

technicians—used by the government as fact witnesses—to testify as experts.  The

Government offered the FBI agents as experience-based experts who would be

asked to testify to the *import* of the lack of forensic evidence—the same "leap" that

Tressel was not allowed to make.  The defense objected, arguing that the

prosecution had failed to communicate its intention to call expert witnesses,

violating the notice provisions of Federal Rule of Evidence 16.[7]  The district court,

---

the jury did not believe the victim, the defense would have "a very strong argument . . . that all of [the victim's] testimony including the kidnapping portion of her testimony should be disregarded," id. at 56.  The court acknowledged that expert testimony would be relevant to the sexual assault issue, see id. at 56-67, and, after eviscerating Tressel's proposed testimony, acknowledged that the Defense had no further use for Tressel, id. at 65-66.

[7]After the Government called Agent Lanning to present rebuttal evidence, the defense objected and the following exchange took place:

Defense:  Your honor, I think that it's just wholly unfair for the government to attempt to use these witnesses that I've called as fact witnesses who

were under their control - - now, the rule does say in their case in chief, but here I think that what the government is doing is playing games to avoid - - to sandbag the defendants. They - - I repeatedly asked [the Government] both in writing and with my initial discovery motion, but also subsequently, if he intended on calling any expert witnesses. And his routine response was, I know, I know my obligations under Rule 16, and I don't have access to these witnesses. They are - - you know, I can subpoena them, but, you know, for instance, I can't get their curriculum vitae, can only subpoena them as witnesses, as fact witnesses. . . .

Court: Well, now, let me ask you a couple of questions. They didn't give you copies of these reports?

Defense: All I got was the - - these - - I - - this is what I got, your Honor.

Court: The scientific reports.

Defense: The scientific report that lists - - that is very - - it states what exhibits they received, what their - - what their analysis showed as to item to item, and what their conclusion was. *Nothing about their underlying, you know, like what their opinion was as to the likelihood that this should or shouldn't be present, the sorts of things you would use an expert to testify to.* And other than what they've elicited on the stand as to their qualifications, I don't know what, you know, what basis they have for making these opinions. I don't know how many rape offenses they have been involved in, I just don't have any way to challenge them. And I didn't have any information to anticipate what they would say to use with another expert that I could call because the Government has avoided Rule 16 by calling them in rebuttal. . . .

[I]f I knew what their - - what they were going to testify to regarding their experience in other rape examinations, like how frequently body fluids are exchanged or whatever, then I could have called perhaps somebody from the GBI lab or from some other lab who is similarly situated to refute that information. . . .

Government: Your Honor, as we said at the beginning, Rule 16 requires us to give expert notice on experts we're going to call in our case in chief. We made a decision not to call experts in our case in chief. We didn't - - we provided the laboratory reports to them, we didn't provide summaries of what they might testify to on other things because we weren't calling them as witnesses. These people have been called by the defense. The rule does not require us to provide a summary of their testimony or anything else if they are going to be in the defense case or in our rebuttal case. . . .

Government: We proffer that we're going *to be asking them about their experience and qualifications in these matters, and asking them what the* **import** *of this testimony they gave in this case was. To wit, what is the* **import** *of the fact that there was nothing found?* Specifically, does the fact that there is no hair transfer found necessarily mean that there is no sexual contact? Does the fact that there was no seminal fluid found necessarily mean that there was no sexual

96

though agreeing with the defense that the Government should have been more forthcoming with its witnesses, ultimately overruled the defense's objection, reasoning that Rule 16 only requires notice when the prosecution calls an expert during its case in chief.[8] Unlike Tressel, the court permitted the technicians to testify as experts regarding "the import of the fact that there was nothing found." R9-363. Not surprisingly, both agents testified that the lack of forensic evidence

---

contact? And we'll talk about the variables that go into whether there is a transfer of seminal fluids. And we'll ask them questions about scientific journal articles that have been written about transfer of hairs. [Other than alluding to the two articles in a very tangential way, the articles were never introduced or entered into evidence. See R9 at 370-71.]

I mean, this, this is to rebut the testimony that the defense has put in. They are telling the jury that this means something, and I've got a right to shine the light on it in rebuttal. That's all.

Defense: How am I without any prior notice supposed to cross-examine a witness on this? And I think in all honesty, Your Honor, what the rule contemplates is that if I call an expert that I have given notice under Rule 16, then the Government can refute that expert in their - - in their rebuttal. But it does not contemplate that out of the blue they are going - - they are going to call an expert witness who they have control over, who they have access to in advance of this trial, and I did not convert this fact witness that they created into an expert witness.

R9 at 359-64 (emphasis mine).

[8]

Court: It's not contrary to the rules because it's not your case in chief. I want to be clear, though, that there is not an inconsistency in my rulings. I said that you could not use Mr. Tressell [sic] as an expert, and I had concerns there about his qualifications in *scientific* areas. I think - - and I don't want to think - - I'm convinced that I did say at the time you could use him for a factual witness and how often this was - - the same as I allowed here, how often this occurs or how often he saw it, but that I would not allow him to express opinions that I thought were beyond his field of expertise.

Id. at 364-65 (emphasis mine).

matching Frazier did not necessarily lead to the conclusion that no sexual contact had occurred.  R9-371, 387.

## B.  Frazier's only Viable Defense was Eviscerated

Allowing the FBI agents to testify as to the import of finding no forensic evidence, while not allowing Tressel to do the same, essentially eviscerated Frazier's principal and only practical defense—questioning the credibility of the victim to show that if the rape did not occur, neither did the kidnapping.[9]  The

---

[9]These inconsistent rulings were perhaps exacerbated by the trial judge's confusion regarding the issue on which he was being asked to rule—namely, whether it was an issue regarding rape or kidnapping.  The following comments illustrate the trial judge's confusion:

Court:  They are endeavoring to prove her raped, as I understand it here . . .

Government:  Excuse me, Your Honor, I hesitate to interrupt, but we're trying to prove a kidnapping.

Court:  I know you're trying to prove a kidnapping, but the issue of the rape is part of it, is it not? . . .

Am I not correct that you're endeavoring to prove a rape which changes the nature of the sentence?

Government:  Not necessarily.  To the extent . . . that we're going to put up a complaining witness who says during my kidnapping I was sexually assaulted, yes . . .

Court:  *I may have the wrong impression about this case. . . .*

I in my mind have been trying to evaluate this to the proof of the crime of rape incidental to the kidnapping, . . .

But I thought there was a question of proving a rape for the purpose of the sentence being a mandatory life as opposed to a kidnapping where there would not be a mandatory life.  Am I correct?

Government:  No, Your Honor . . .  The sexual assault is not an element of the kidnapping . . .

Court:  No, it isn't.  I agree with you.  That's where I was under the misapprehension, and I thought there was - - that you had a burden - - I don't know where I got this from. . . .

Court:  All right.  *Then I had the wrong impression*, but, again,

98

district court even admitted as much.[10]  Needless to say, the Government, in its

closing statement, stressed the importance of the testimony of Lanning and Onorato

that the lack of forensic evidence did not mean that the rape—and, hence, the

kidnapping—did not occur.  The Government also mentioned the scientific

"studies" that it required of Tressel but not of its own experts.[11]  The defense, on

---

that's part of the fallacy of - - this is my first contact with the case.  Unlike the
Magistrate is the one who has had dealings with it, I don't even know that I have
actually seen the indictment.  In fact I don't think I have.
        All right.  The rape then is not an essential element of the crime, right?
        Defense:  It's not an essential element of the crime, but it's a central
part of [the victim's] allegation that she was kidnapped, and *certainly as a defense
lawyer whether or not there was a sexual assault is absolutely critical to my
impeaching her credibility on the kidnapping itself*. . . .
        Defense:  And I think pretty much whether or not there actually was
a kidnapping is based almost entirely on [the victim's] testimony, and that's why
her description of what happened, and if this focal point of her story is not to be
believed by the jury, then I have, again as Mr. Frazier's lawyer, a very strong
argument to the jury that all of her testimony including the kidnapping portion of
her testimony should be disregarded, as well.
        Court:  All right.  *I am beginning to focus on the issues and the
relevance now*. . . .
        Court:  *I think I am getting focused because I only got your brief
that was filed just today just a few minutes before I came in* . . .
R5 at 52-54, 56-57 (emphasis mine).

[10]Defense counsel advised the court that whether a sexual assault occurred is "absolutely
critical to . . . impeaching [the victim's] credibility on the kidnapping itself," id. at 54, and that, if
the jury did not believe the victim, the defense would have "a very strong argument . . . that all of
[the victim's] testimony including the kidnapping portion of her testimony should be
disregarded," id. at 56.  The court acknowledged that expert testimony would be relevant to the
sexual assault issue, see id. at 56-67, and, after eviscerating Tressel's proposed testimony,
acknowledged that the Defense had no further use for Tressel, id. at 65-66.

[11]In its closing argument, the Government stated:
        Now, you heard a lot of testimony today and the defense has
presented evidence to you trying to get you to focus on evidence of the
rape examination kit and the examination clothes, and wanted to point out

99

the other hand, without any experts to quote or studies on which to rely, could only

make the bald argument that the lack of forensic evidence did not support the

victim's account of the events.[12]

_____

> to you that no hair was found and no semen was found. And they want to take your attention away from what happened to [the victim] and focus on this so that you will conclude, we assume, that well, no - - no hair was found and no semen was found, and we point to a couple of other problems, and based on that, you need to conclude, I think they are going to argue, that you can't believe [the victim] about the sexual assault. And if you can't believe her about the sexual assault, you can't believe her about the kidnapping. Well, that's not true. . . .
>
> First of all, the fact that no hair is found doesn't mean anything. As you heard from the *studies* involved there are lots of cases where no hairs are found. A majority - - *large majority of cases* where no hair is found. . . .
>
> *The witness testified, Mr. Onorato just a few minutes ago, that in the rape kits he does, perhaps 20 or 25 percent of the time he doesn't find any.*

R9 at 407-09 (emphasis mine).

[12]During its closing argument, the defense stated:

> The whole purpose of the government's case, their whole scenario is that Mr. Frazier kidnapped [the victim] to rape her. And, if you listen to [the victim's] story, the focal point of this whole story is the rape. If the sexual assault did not occur, then I submit that you have to - - that so impacts [the victim's] credibility that you cannot convict him of [kidnapping]. . . .
>
> [B]efore you can convict somebody of something as serious as kidnapping or anything, really, but certainly in this case, you have got to look at the extent to which you can corroborate what [the victim] says or does the evidence say that she is not being truthful about something? And that's the significance - - that is why the rape in this case becomes so significant because it's such a large portion of what she describes. . . .
>
> [T]here is no hair. No, no hair, no semen, no liquid, forget the semen. Why is there - - we've got all of this - - this activity, movement back and forth in the car, and you know, look at him. He's a hairy man. We don't have any hair falling off into the car?
>
> And we have the FBI collecting all of this evidence. Are they going to now say, oh, well, we're really pretty shoddy at this. No. We know they have

Frazier appealed, arguing that the district court abused its discretion when it limited Tressel's testimony under the guise of <u>Daubert</u>, thereby eviscerating his only viable defense.

## II. DISCUSSION

In this section, I will (a) state the proper standard of review, (b) discuss the district court's erroneous <u>Daubert</u> rulings, and (c) discuss the effect of this ruling on Frazier's ability to present a meaningful defense.

A. <u>Standard of Review</u>

---

problems at the lab, but there is no indications we have any problems in this case with the collection of evidence. You saw it, you heard it, you see it, they rip the car apart and send it to the lab. No, not one speck of hair from this. And we're not, again, I think the lack of pubic hair is pretty significant when you've got all of this activity on the front seat of the car.

<u>Id.</u> at 417, 419, 428-29.

The search warrant described the "activity" in the Ford Escort as follows:
[The victim] stated that . . . [ ] Frazier, while having [the victim] at knife point, told [the victim] to take her pants and panties off, at which she did. [The victim] stated that [ ] Frazier put his hand in her vagina and began rubbing it. [The victim] stated that [ ] Frazier then took his clothes off and asked [the victim] if the seat reclined. [The victim] stated that she told Frazier that they did not recline back. [The victim] stated that [ ] Frazier had sex with her on the bottom and [ ] Frazier on the top. [The victim] stated that [ ] Frazier got up and told her to get on top, which she did. [The victim] stated that after that [ ] Frazier told her to, "suck my dick", in which she complied. [The victim] stated that [ ] Frazier told her to get on her hands and knees, which she did and [ ] Frazier inserted his penis into her anus.
 [The victim] stated that [ ] Frazier had sex with her again.

Def. Ex. 5, Attach. A.

101

We review a district court's exclusion of expert testimony under the federal rules of evidence for an abuse of discretion. United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999). As for the district court's interpretation of Federal Rule of Evidence 702, our review is plenary. Id. No error regarding the admission or exclusion of evidence is reversible "unless a substantial right of the party is affected." Fed. R. Evid. 103(a).

B.  The District Court's *Daubert* Rulings

Rule 702 of the Federal Rules of Evidence allows "a witness qualified as an expert by knowledge, skill, experience, training, or education" to testify "in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case," provided that the "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993), the Supreme Court "assign[ed] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Id. at 597, 113 S. Ct. at 2799.

Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.

Id. at 592, 113 S. Ct. at 2796 (footnotes omitted). Thus, for proffered expert testimony to be admissible, a court must determine that:

(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562 (11th Cir. 1998).

But while "[t]he judge's role is to keep unreliable and irrelevant information from the jury," it "is not intended to supplant the adversary system or the role of the jury." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999). The admissibility standard is a liberal one, United States v. Hankey, 203 F.3d 1160, 1168 (9th Cir. 2000), and "[a] review of the caselaw after Daubert shows that the rejection of expert testimony is the *exception* rather than the rule." Fed. R. Evid. 702 advisory committee notes, 2000 amends. (emphasis mine).

> Courts have found that an abuse of discretion occurs when under
> Daubert the admissibility bar is too high. . . . "Trial judges must
> exercise sound discretion as gatekeepers of expert testimony under
> Daubert. . . . [We must not] elevate them to the role of St. Peter at the
> gates of heaven, performing a searching inquiry into the depth of an
> expert witness's soul—separating the saved from the damned."

Allison, 184 F.3d at 1321 (citation omitted) (quoting McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1045 (2d Cir. 1995)).

Because the district court forbade Tressel from testifying to two key propositions, I address each proposition in turn and then discuss how the district court's ruling was incorrectly and inconsistently applied.

1. Tressel's Opinion on the Import of the Lack of Forensic Evidence

The district court would not allow Tressel to draw any inferences that the lack of forensic evidence did not substantiate the victim's claim of rape because it would invade the jury's province and usurp its role in deciding the penultimate issue of whether rape actually occurred. However, "it is part of the normal role of the expert not merely to describe patterns of conduct in the abstract, but to connect actions in a specific case to those patterns—sometimes even to the point of testifying that the defendant was [or was not] involved in criminal conduct." United States v. Boney, 977 F.2d 624, 629 (D.C. Cir. 1992). "Rule 702 does not bar an expert from drawing conclusions in a specific case . . . [and] does not require

104

that any inferences from the facts in the specific case be left to the jury." Id. Thus, experts may "take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts." Fed. R. Evid. 702 advisory committee notes, 1972 Proposed Rules. This is true even if the testimony "merely assist[s] the jury in interpreting the significance of the evidence," United States v. Brown, 7 F.3d 648, 654 (7th Cir. 1993), draws on "common sense," United States v. Glover, 265 F.3d 337, 345 (6th Cir. 2001), or, while helpful, is nonetheless "obvious," United States v. Sellers, 566 F.2d 884, 886 (4th Cir. 1977). Indeed, "whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert's testimony often will rest 'upon an experience confessedly foreign in kind to [the jury's] own.'" Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S. Ct. 1167, 1174 (1999) (citation omitted) (emphasis mine).

In Brown, for instance, the defendant had been convicted of possession with intent to distribute cocaine base. 7 F.3d at 649. On appeal, "the issue was whether [he] possessed the twenty-five rocks of crack cocaine for distribution or for personal use." Id. at 652. The government's expert identified certain indices that are commonly associated with drug dealers. "He also described the typical

paraphernalia associated with street-level crack distributors and compared that with the paraphernalia and behavior patterns usually associated with those possessing crack only for personal use." Id. at 650. From this information, the expert concluded that the crack cocaine seized from the defendant was not intended for personal consumption, but for distribution. Id. The defendant objected, arguing that the jury could draw its own inferences from the habits and practices testimony of the expert. Id. at 652. The Seventh Circuit affirmed the district court's refusal to exclude the testimony on the ultimate issue, reasoning that "the average juror might be unable to determine *whether the absence* of certain drug paraphernalia typically associated with crack cocaine *is significant*." Id. (emphasis mine); see also Erickson v. Baxter Healthcare, Inc., 131 F. Supp. 2d 995, 1001 (N.D. Ill. 2001) (permitting medical expert to testify that information contained in the plaintiff's medical records did not support one of her allegations).

In the same way, Tressel's conclusion in this case—that the *absence of any forensic evidence* did not substantiate the claim of rape—would have helped the jury to understand the *significance* of the negative implication to be drawn; what the prosecution even referred to as the **"*import*"** of the lack of evidence. R9 at 363. Its exclusion by the district court was therefore an abuse of its discretion. Tressel's proffered testimony did not state a legal conclusion as to Frazier's guilt or

106

innocence, and it did not "tell the jury what result to reach." Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir.1990). His analysis was clear and was supported by undisputed factual findings as to the evidence retrieved from the alleged crime scene. No mere "oath-helper," Hanson v. Waller, 888 F.2d 806, 811 n.2 (11th Cir. 1989), Tressel's testimony would have assisted the average juror, unqualified "to determine intelligently and to the best possible degree," United States v. Lankford, 955 F.2d 1545,1558 (11th Cir. 1992) (Hoffman, J., dissenting), what to make of the fact that not a single shred of physical evidence was presented to link Frazier to the alleged victim qua victim in this case. His testimony would have assured against any tendency to over- or underestimate the value of this finding; indeed, the lack of forensic evidence could neither exonerate nor condemn Frazier of the rape, but only failed to substantiate it. To exclude such helpful testimony on the inappropriate ground relied on by the district court was manifestly reversible error.

### 2. Tressel's Opinion on the Evidence He Would Expect to Find in This Case

The trial court also refused Tressel's proffered testimony that "it would be expected that some transfer or either hairs or seminal fluid would occur in this case" because it found this testimony unreliable for lack of *scientific* data. R5 at

107

24, Ex. 2 at 2. In particular, the district court faulted Tressel for not having rested his conclusion on any empirical study and disfavored his testimony because it was couched in qualitative terms rather than hard numbers or statistical data. See note 3, infra. This ruling was based on an incomplete understanding of the background required of an expert witness.

The text of Rule 702 dictates that expert status may be based on *experience*, and the Advisory Committee Notes dictate that experience alone "may . . . provide a sufficient foundation for expert testimony." Rule 702 cmt. at 290. Without doubt, the Supreme Court's ruling in Daubert imposes difficult gatekeeping duties on trial courts, one of which involves an exacting assault to the foundation of any proposed expert testimony to determine whether it is plumb or stands out of true, resting on shaky and unreliable ground. To survive this juridic ordeal and meet the standard of evidentiary reliability, expert testimony must be (1) "ground[ed] in the methods and procedures of science," (2) authenticated by "more than subjective belief or unsupported speculation," and (3) "supported by appropriate validation—i.e., 'good grounds,' based on what is known." Daubert, 509 U.S. at 590, 113 S. Ct. at 2795. "[T]he trial court must scrutinize not only the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case." Fed. R. Evid. 702 advisory

committee's note, 2000 amends. While the court must focus "solely on principles and methodology, not on the conclusions that they generate," Daubert, 509 U.S. at 594, 113 S. Ct. at 2797, "conclusions and methodology are not entirely distinct from one another," and "nothing . . . requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997).

This pre-trial by fire "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Kumho Tire, 526 U.S. at 141, 119 S. Ct. at 1171. Thus, all expert opinion "must be the product of reliable principles and methods that are reliably applied to the facts of the case." Fed. R. Evid. 702, advisory committee notes, 2000 amends. "The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or *experience* in the expert's field, and the expert must explain how the conclusion is so grounded." Id. (emphasis mine).

109

This uncompromising emphasis on reliability does not mean, however, that the personal experience or knowledge of the expert alone is not to be trusted. "To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of *experience*. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Id. (emphasis mine). Indeed, "there are many different kinds of experts, and many different kinds of expertise." Kumho Tire, 526 U.S. at 150, 119 S. Ct. at 1175. Even after Kumho Tire, "there is no question that an expert may still properly base his testimony on 'professional study or personal experience.'" Maiz v. Virani, 253 F.3d 641, 668-69 (11th Cir. 2001) (holding that expert testimony on the "passport-stamping practices of Mexican immigration officials . . . based largely on [the expert's] personal *experience* rather than verifiable testing or studies" was admissible) (emphasis mine).

However, this type of expert testimony generates certain difficulties in evaluating its reliability: "Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise." Fed. R. Evid. 702 advisory committee notes, 2000 amends. "[A]n expert's qualifications and the reliability of his testimony do not always separate into a clear dichotomy," United

110

States v. Jones, 107 F.3d 1147, 1160 (6th Cir. 1997), and, in fact, are often blurred in the case of experience-based expert testimony. Where "the relevant reliability concerns may focus upon personal knowledge or experience," Kumho Tire, 526 U.S. at 150, 119 S. Ct. at 1175, "inquiries into an expert's qualifications, the reliability of his proffered opinion and the helpfulness of that opinion" frequently overlap to a significant degree. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003).

Even so, these "are distinct concepts that courts and litigants must take care not to conflate." Id. "The trial court's gatekeeping function requires more than simply taking the expert's word for it." Fed. R. Evid. 702 advisory committee notes, 2000 amends. (citation and internal quotation marks omitted). All experts, "whether basing testimony upon professional studies or personal experience, [must] employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, 526 U.S. at 152, 119 S. Ct. at 1176. Courts must be creative when applying this panoptic principle, more accommodating in theory than in practice. While the Court in Daubert developed four, non-exhaustive measures of reliability,[13] it emphasized that "[t]he inquiry

---

[13]These are whether proffered scientific knowledge can be (and has been) tested, whether a theory or technique has been subjected to peer review or publication, whether the "known or potential rate of error" of a scientific technique is within acceptable bounds for the particular

envisioned by Rule 702 is . . . a flexible one."  509 U.S. at 594, 113 S. Ct. at 2797.

"[T]hose factors do not all necessarily apply even in every instance in which the

reliability of scientific testimony is challenged."  Kumho Tire, 526 U.S. at 151, 119

S. Ct. at 1175.  Whether they do "depend[s] on the nature of the issue, the expert's

particular expertise, and the subject of his testimony."  Id. at 150, 119 S. Ct. at

1175 (citation and internal quotation marks omitted).[14]  In short, while adapting the

reliability inquiry to the nature of the testimony proffered, courts must still look

long and hard at the expert's principles and methods:

> For example, when a law enforcement agent testifies regarding the use
> of code words in a drug transaction, the principle used by the agent is
> that participants in such transactions regularly use code words to
> conceal the nature of their activities.  The method used by the agent is

---

discipline, and to what extent the evidence has been accepted within the "relevant scientific community."  509 U.S. at 593-94, 113 S. Ct. at 2796-97.

The Advisory Committee Notes to Rule 702 delineate five additional factors in determining reliability: (1) Whether the testimony "grow[s] naturally and directly out of research [experts] have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"; (2) "Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion"; (3) "Whether the expert has adequately accounted for obvious alternative explanations"; (4) "Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting"; and (5) "Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give."  Fed R. Evid. 702 advisory committee's notes, 2000 amends. (citations and internal quotation marks omitted).

[14]For example, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  Fed. R. Evid. 702 advisory committee's notes, 2000 amends.

the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.

Fed. R. Evid. 702 advisory committee's notes, 2000 amends.

Case law is replete with judicially-sanctioned instances of this type of deductive reasoning. For instance, physicians and other professionals,[15] valuation experts,[16] experts on industry customs and practices,[17] and handwriting analysts[18]

---

[15]See, e.g., McGuire v. Davis, 437 F.2d 570, 572 (5th Cir. 1971) (recognizing "the well-settled proposition that a physican who has examined an injured party may describe what he has seen and give his expert inferences therefrom"); Smith v. BMW N. Am., Inc., 308 F.3d 913, 919 (8th Cir. 2002) (concluding that a physician's testimony as to the cause of the plaintiff's injuries is admissible where "[h]e applied his medical knowledge and his experience to the physical evidence and came to a conclusion as to the cause of Smith's neck injury"); Heller v. Shaw Indus., Inc., 167 F.3d 146, 154 (3d Cir. 1999) (concluding that a physician is not required "to rely on definitive published studies before concluding that exposure to a particular object or chemical was the most likely cause of a plaintiff's illness"); United States v. Pollard, 128 F. Supp. 2d 1104, 1123 (E.D. Tenn. 2001) (finding that a physician's testimony as to the age of young girls in a pornographic videotape is admissible where it is based only "upon multiple personal viewings of the video and the correlation of his observations to a lengthy clinical experience in assessing chronologic age based on physical and sexual development" because he was "properly qualified and possess[ed] valid scientific and/or technical knowledge"); Protocomm Corp. v. Novell Advanced Servs., Inc., 171 F. Supp. 2d 473, 479-80 (E.D. Penn. 2001) (finding the conclusions of a forensic accountant reliable because he "based his opinions on personal knowledge and experience, as well as a seemingly copious review of a multitude of relevant business documents").

[16]See, e.g., United States v. Conn, 297 F.3d 548, 556-57 (7th Cir. 2002) (recognizing that, just as experienced law enforcement agents may apply "knowledge gained through years of experience" to the facts in a particular case, a gun expert may "appraise, on the basis of his past experience and training, the value of . . . firearms found in [a criminal defendant's] residence").

[17]See, e.g., Maiz, 253 F.3d at 668-69 (holding that expert testimony based on personal experience was admissible to establish "the passport-stamping practices of Mexican immigration officials" even in the absence of any "verifiable testing or studies"); Marx & Co., Inc. v. Diner's

are often permitted to derive their conclusions in this fashion. After all, "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience,'" id. at 148, 119 S. Ct. at 1174 (citation omitted), and "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Id. at 156, 119 S. Ct. at 1178.

Considering the four, non-exhaustive measures of reliability developed by the Daubert Court, "[g]eneral acceptance in the community is an important factor in evaluating an expert's methodology and courts particularly emphasize this Daubert factor when reliability focuses on experience." Groobert v. President & Dirs. of Georgetown Coll., 219 F. Supp. 2d 1, 8 (D.C. 2002). The other Daubert factors often recede in importance.[19] "The more subjective and controversial the expert's

Club, Inc., 550 F.2d 505, 509 (2d Cir. 1977) ("Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs.").

[18]See, e.g., United States v. Paul, 175 F.3d 906, 909-10 (11th Cir. 1999) (upholding district court's admission of handwriting expert's testimony based on personal experience and knowledge of general principles in the field over an unreliability objection); Jones, 107 F.3d at 1160-61 (upholding district court's decision to admit handwriting expert's testimony based on his "various training experiences, his job responsibilities, his years of practical experience, and the detailed nature of his testimony").

[19]See, e.g., City of Tuscaloosa, 158 F.3d at 566 n.25 (recognizing that testability is not a proper measure of reliability for economic or statistical analyses of allegedly collusive markets "because each such case is widely different from other such cases and because such cases cannot be made the subject of repeated experiments"); Hankey, 203 F.3d at 1169 ("The Daubert factors .

114

inquiry, the more likely the testimony should be excluded as unreliable." Fed. R.

Evid. 702 advisory committee notes, 2000 amends. By the same token, the less

controversial a conclusion, the more likely it is reliable. For example, it may "be

useful to ask even of a witness whose expertise is based purely on experience, say,

a perfume tester able to distinguish among 140 odors at a sniff, whether his

preparation is of a kind that others in the field would recognize as acceptable."

Kumho Tire, 526 U.S. at 151, 119 S. Ct. at 1176. Therefore, "that an expert's

opinion is not based on statistical studies does not render that opinion inadmissible,

provided that . . . the testimony is based on reasoning or methodology generally

---

. . simply are not applicable to [criminal practices] testimony whose reliability depends heavily
on the knowledge and experience of the expert, rather than the methodology or theory behind
it.").

accepted within a particular profession or discipline."[20] <u>Katt v. City of New York</u>,

151 F. Supp. 2d 313, 356 (S.D.N.Y. 2001).

This is all the more true, as in this case, where *probative* quantitative studies

are unavailable. For instance, one court refused to admit a physician's statistical

testimony based on general experience. "To allow doctors to testify about specific

statistical or medical questions and base their testimony only on general experience

would be to say that doctors are qualified experts on every medical subject merely

because they wear white coats." <u>Erickson</u>, 131 F. Supp. 2d at 999. But the same

court permitted similarly based qualitative testimony:

> Although mere experience in the field is not a reliable basis for . . .
> specific statistical . . . opinions . . . , here [the] opinion does not
> concern a specific statistic, but instead concerns the common

---

[20]The district court's rulings suggest that, if only Tressel had been willing to testify with the careless grace of the government's witnesses, providing the court with slapdash, but facially numerical, guesstimations, his testimony may have been admitted. R5 at 68-70; <u>see</u> <u>also</u> Maj. Op. at * 43-45 (characterizing Tressel's testimony as unreliable because he could not quantify the word "expect" or describe a sufficient number of sexual assault investigations to support his conclusions). To favor this brand of off-the-cuff approximations over well-settled, qualitative principles published in numerous editions of the field's leading textbook is hardly, to put it mildly, the hallmark of sound judicial practice. Not only does it create a perverse incentive for experts to fortify overstated conclusions in a manner largely unverifiable by the courts, it circumvents the spirit and letter of <u>Daubert</u>'s principles. As one court so tersely put it, "a number pulled out of the air is not 'scientific knowledge.'" <u>Erickson</u>, 131 F. Supp. 2d at 1000. Rather than resort to farcical solutions to difficult problems, courts should recognize that the contest between valid qualitative and quantitative data is properly one for the jury. <u>See</u> <u>Daubert</u>, 509 U.S. at 596, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

> knowledge in the field at the time. Experts have knowledge of the standards that govern their fields—that is part of what qualifies them as experts. . . . Although it would be ideal to have a citation to some medical publication to support th[e] proposition, [an expert] may testify about the standards or common knowledge of the [relevant academic] community . . . .

Id. at 1001. The Third Circuit likewise recognized that an expert's "testimony is neither conjecture nor speculation" merely because there is no available publication to substantiate it if the testimony is "well recognized by the scientific community," "not a novel scientific theory," and "supported by widely accepted scientific knowledge," and the expert "relied on general experience and readings, general medical knowledge, standard textbooks, and standard references." Kannankeril v. Terminix Internat'l, Inc., 128 F.3d 802, 809 (3d Cir. 1997). Thus, expert opinion is not inherently unreliable merely for want of empirical studies if the information is commonplace in the field and "[s]tatistical methods are . . . not invariably used in such research." Katt, 151 F. Supp. 2d at 357. Where "experience-based studies are generally accepted in the industry," a "court cannot penalize [a litigant] for the lack of scientific or academic studies and public reports on the topic. . . ." Groobert, 219 F. Supp. 2d at 9, 11; accord Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1385 (4th Cir. 1995) (holding that a "defendant should not be allowed 'to escape liability

117

simply because . . . there are, as yet, no . . . studies concerning [the specific subject area]'") (citation omitted).

A useful construct is to imagine these two factors—whether the principle is common knowledge in the field and whether quantitative studies are available—as positioned within a four-part box. Just as no trial court would abuse its discretion by refusing to admit expert testimony considered experimental or speculative in the field for which quantitative studies were available,[21] a trial court would most certainly abuse its discretion in many instances—like this one—by refusing to admit qualitative testimony for want of statistical support where the analytic assumptions were widely-held and relevant and probative statistical data unavailable.

The district court in this case did not question Tressel's experience—his participation in 150 sexual assault cases and thousands of crime scene investigations—or the application of that experience to the undisputed facts of the case—the absence of any physical evidence to link Frazier to the crime of rape. The court instead forbade his testimony because it was stated qualitatively, not quantitatively, and not because he failed to cite any authority in the field for the

---

[21]See, e.g., Boncher v. Brown County, 272 F.3d 484, 486-87 (7th Cir. 2001) (upholding district court's rejection of expert testimony that the number of jail suicides in the instant case was "unusually high," where studies on jail suicide rates were presumably available).

proposition.  <u>See</u> note 2, <u>infra</u>.  That certain symptoms are indicative of particular illnesses, that certain customs and practices are frequently used in particular industries, legal or illegal, or that certain patterns of handwriting are distinctive have rarely been challenged as an unreliable basis for expert testimony just because they are not explicitly validated by quantitative research; even where such quantitative data could have been collected (e.g., the Government could collect data as to how drug dealers, money launderers, etc., do business based on collective data from case studies).  Courts recognize that such principles are commonly known, widely-accepted, and often taken for granted in the relevant academic community.  They need not be substantiated empirically because they have risen to the rank of platitudes within their respective fields.

This is what the Supreme Court meant when it instructed trial courts to ensure that an expert relying on personal experience "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  <u>Kumho Tire</u>, 526 U.S. at 152, 119 S. Ct. at 1176.  What physician, for example, would be laughed out of a medical conference for asserting without supporting statistical data that he would expect the cause of classic flu-like symptoms to be, of all things, the flu?  Yet, this is precisely what the district court did in response to Mr. Tressel's testimony based on the rather uncontroversial

assumption in his field that an experienced forensic investigator would expect to find hair or semen transfer in a sexual assault of prolonged duration in cramped quarters where, as here, evidence was gathered from an uncontaminated and confined crime scene. This ruling—requiring an experience-based expert to substantiate his conclusions with scientific data or studies—was an abuse of discretion.

### 3. The District Court's *Daubert* Rulings were Inconsistent

The trial court's <u>Daubert</u> error was compounded: it excluded Tressel's testimony relating to the *import* of the lack of forensic evidence found at the crime scene—on the ground that this conclusion was not supported by scientific data—and yet allowed the Government's witnesses to testify to this very issue—without similarly requiring scientific support for their conclusions. On rebuttal, the Government was allowed to convert two defense fact witnesses—the FBI agents—into experts. Like the defense's proffer of Tressel's testimony, the Government offered the FBI agents as experience-based experts who would be asked to testify as to the *import* of the lack of forensic evidence found at the crime scene.[22] Over the defense's objection, the two agents, not surprisingly, testified that

---

[22]The Government stated: "We proffer that we're going to be asking them about their experience and qualifications in these matters, *and asking them what the **import** of this testimony they gave in this case was. To wit, was is the **import** of the fact that there was nothing found?*"

the lack of forensic evidence matching Frazier did not prove that he had not committed the alleged sexual assaults. R9-363, 371, 387.

"It is an abuse of discretion 'to exclude the otherwise admissible opinion of a party's expert on a critical issue, while allowing the opinion of his adversary's expert on the same issue.'" United States v. Gaskell, 985 F.2d 1056, 1063 (11th Cir. 1993) (per curiam); accord United States v. Garber, 607 F.2d 92, 95-97 (5th Cir. 1979) (en banc). This was the district court's particular transgression here, and it constituted an abuse of discretion.

In United States v. Gaskell, we held that it was an abuse of discretion for the district court to allow the Government to present expert testimony on the determinative issue in that case, while not similarly allowing the defense to present its expert testimony. 985 F.2d at 1062-64. Gaskell involved a father charged with murdering his infant daughter by shaking her to death. Id. at 1058. The key issue was whether this shaking was willful or accidental. Id. at 1062. The Government was allowed to proffer the testimony of its expert, who stated that, "We are all taught to support the baby's head. It's fragile. You don't want to shake a baby's heads [sic]." Id. (citation omitted). The defense was forbidden, however, from

_____

R9 at 363 (emphasis mine).

121

proffering the testimony of its expert, who would have testified to "the general lack of public awareness of the dangers of shaking an infant." Id. We held that the exclusion of the defense's expert was an abuse of discretion and that this error was "compounded" by the allowing the Government to present its experts. Id. at 1063-64.

In this case, similar to Gaskell, the key issue is the import of the lack of forensic evidence found in a cramped crime scene after allegedly numerous acts of sexual activity. Like in Gaskell, the district court allowed the Government to present the testimony of its expert witness as to the import of this lack of evidence, but did not similarly allow the defense to present its expert on the issue. The district court thus abused its discretion by refusing to allow the defense's expert testimony regarding the import of the lack of forensic evidence, and this error was compounded when the Government was allowed to present expert testimony on this same issue.

C. Effect of *Daubert* Error on Frazier's Defense

While abuse of discretion is undoubtedly the measuring stick we use to evaluate the evidentiary decisions of trial courts, we cannot apply it in a vacuum. We must never forget that, in criminal cases, the life and freedom of a real

individual are at stake. "[T]here are certain immutable principles of justice, which inhere in the very idea of free government, which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice, and an opportunity of being heard in his defense." Holden v. Hardy, 169 U.S. 366, 389-90, 18 S. Ct. 383, 387 (1898). "[B]y 'the law of the land' is intended 'a law which hears before it condemns.'" Powell v. Alabama, 287 U.S. 45, 68, 53 S. Ct. 55, 64 (1932) (citation omitted).

> A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.

In re Oliver, 333 U.S. 257, 273, 68 S. Ct. 499, 507-08 (1948). "Judgment without such citation and opportunity . . . can never be upheld where justice is justly administered." Hovey v. Elliott, 167 U.S. 409, 418, 17 S. Ct. 841, 845 (1897) (citation and internal quotation marks omitted). "A defendant who has been denied an opportunity to be heard in his defense has [indeed] lost something indispensable." Snyder v. Massachusetts, 291 U.S. 97, 116, 54 S. Ct. 330, 336 (1934).

"Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that *criminal defendants be afforded a meaningful opportunity to present a complete defense*." California v. Trombetta, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532 (1984) (emphasis mine); accord United States v. Beard, 436 F.2d 1084, 1086 (5th Cir. 1971).

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses . . . , he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

Washington v. Texas, 388 U.S. 14, 19, 87 S. Ct. 1920, 1923 (1967). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Chambers v. Mississippi, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973). True enough, a defendant has no right to put on inadmissible evidence or unreliable expert testimony. See Johnson v. Wainwright, 806 F.2d 1479, 1485 (11th Cir. 1986); Phillips v. Wainwright, 624 F.2d 585, 588 (5th Cir. 1980).

Several cases in our own circuit support the proposition that a criminal defendant must be allowed to present a complete defense. In particular, we have

124

reversed lower court rulings that have excluded defense testimony where we thought a stricter standard of review prudent.

> The trial court is vested with broad discretion in ruling upon the relevancy and admissibility of evidence. Its ruling will not be disturbed on appeal in the absence of clear abuse of that discretion. *Such discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense.*

United States v. Kelly, 888 F.2d 732, 743 (11th Cir. 1989) (citation and internal quotation marks omitted) (emphasis mine). "'When proffered [defense] evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'" United States v. Terebecki, 692 F.2d 1345, 1351 (11th Cir. 1987) (Hill, J., dissenting) (quoting United States v. Wasman, 641 F.2d 326, 329 (5th Cir. Unit B Apr. 2, 1981)). There can be no question but that Frazier's proffered expert testimony here was fundamental to his case. Informing the jury in simple, declarative terms that forensic evidence did not exist to substantiate the claim of rape and that hair or fluid transfer would have been expected in this type of case, would have allowed it "to hear the whole story." United States v. Word, 129 F.3d 1209, 1213 (11th Cir. 1997).

In addition, we have also expressly relaxed otherwise strict admissibility criteria when it is the defendant who seeks to introduce evidence under Rule 404(b) of the Federal Rules of Evidence. In reversing the district court, we said:

> Rule 404(b) is normally used by the government to show evidence of prior similar offenses committed by the defendant. In such cases, strict standards for admissibility protect the defendant from prejudice. But in the case before us it was the defendant who sought to introduce evidence of the informant's scheme. His right to present a vigorous defense required the admission of the proffered testimony.

United States v. McClure, 546 F.2d 670, 673 (5th Cir. 1977); see also Cohen, 888 F.2d at 776 (observing that "the standard for admission is relaxed when [FRE 404(b)] evidence is offered by a defendant"). There is no principled reason to begrudge a criminal defendant this same remedial benefit for the admissibility of expert testimony under Daubert.

### III. CONCLUSION

I conclude that the district court abused its discretion when, under the guise of Daubert, it required Tressel, an experience-based expert witness, to support his conclusions with scientific data or studies. The majority concedes this, but then ignores it. See Maj. Op. at * 40; note 4, infra. This Daubert error was compounded when the Government's experience-based expert witnesses were not similarly required to support their conclusions with any scientific or statistical information.

126

The district court's erroneous <u>Daubert</u> ruling, in effect, eviscerated Frazier's principal and only practical defense. Based on the district court's incorrect <u>Daubert</u> ruling, and because I am convinced that, in cases like this, the defendant's Sixth Amendment right to a fair trial should circumscribe an interpretation of the rules of evidence eviscerating his defense, I must respectfully dissent.